[No. S043581. Dec. 26, 1995.]

LISA M., Plaintiff and Appellant, v.
HENRY MAYO NEWHALL MEMORIAL HOSPITAL, Defendant and
Respondent.

**COUNSEL**

R. Rex Parris and Michael R. Smith for Plaintiff and Appellant.

Ian Herzog, Douglas Devries, Roland Wrinkle, Harvey R. Levine, Robert Steinberg, Thomas G. Stolpman, William D. Turley, Mary E. Alexander, Bruce Broillet, Wayne McClean, Leonard Sacks, Tony Tanke, Leonard Esquina, David Rosen, Gordon, Edelstein, Krepack, Grant, Felton & Goldstein and Steven J. Kleifield as Amici Curiae on behalf of Plaintiff and Appellant.

Veatch, Carlson, Grogan & Nelson, John B. Loomis, C. Snyder Patin, Horvitz & Levy, Barry R. Levy and David S. Ettinger for Defendant and Respondent.

Beach, Procter, McCarthy & Slaughter, Thomas E. Beach, Sean D. Cowdry, Greines, Martin, Stein & Richland, Martin Stein, Marc J. Poster, Priscilla F. Slocum, Thelen, Marrin, Johnson & Bridges, Curtis A. Cole and Jason G. Wilson as Amici Curiae on behalf of Defendant and Respondent.

**OPINION**

**WERDEGAR, J.**—Plaintiff Lisa M. was injured in a fall and sought treatment at defendant Henry Mayo Newhall Memorial Hospital (Hospital). Under the pretense of conducting an ultrasound imaging examination, a technician sexually molested her. In plaintiff's action against Hospital and others, the trial court granted summary judgment in favor of Hospital; the Court of Appeal reversed. The question presented is whether Hospital, even if not negligent in employing or supervising the technician, may be held vicariously liable for his misconduct under the doctrine of respondeat superior. We conclude the undisputed facts show Hospital is not vicariously liable.

### FACTS AND PROCEDURAL BACKGROUND

The facts are taken largely from the declarations and depositions submitted in support of and opposition to Hospital's motion for summary judgment. Some undisputed facts are taken from the parties' separate statements of undisputed facts. (Code Civ. Proc., § 437c, subd. (b).)

On July 9, 1989, plaintiff, 19 years old and pregnant, was injured in a fall at a movie theater and sought treatment at Hospital's emergency room. At

the direction of the examining physicians, ultrasound technician Bruce Wayne Tripoli performed obstetrical and upper-right-quadrant ultrasonic imaging examinations.

Tripoli took plaintiff to the ultrasound room on a gurney. She remained in her street clothes, shorts and a maternity top. No one else was present during the examination; plaintiff had asked that her boyfriend accompany her, but Tripoli refused the request, as was his practice in conducting emergency obstetrical examinations. Tripoli turned out the room lights but left the adjacent bathroom door ajar to admit dim light.[1]

Tripoli first conducted the prescribed examinations. Plaintiff pulled up her shirt and pushed her shorts down to expose the area to be examined. The obstetrical or "general pelvic" examination requires passing an ultrasound-generating wand across the patient's lower abdomen. The sound waves must be mediated by a gel, which Tripoli testified must be worked into the skin somewhat to displace all the air. The exact placement and movement of the wand varies with the patient's body type, and on some patients the best images are obtained by passing the wand as much as an inch below the pubic hairline. Tripoli found it necessary to do so in plaintiff's case. In performing the upper right quadrant examination (to see the liver), Tripoli had to lift plaintiff's right breast, which he did through a towel with the back of his hand.

After conducting the ordered examinations, Tripoli left the room for about 10 minutes to develop the photographic results. On his return, Tripoli asked plaintiff if she wanted to know the sex of the baby, and she said she did. He told her, falsely, that to determine the sex he would need to scan "much further down," and it would be uncomfortable. With plaintiff's cooperation, Tripoli pulled plaintiff's shorts down and began to scan in her pubic hair. According to plaintiff, he also inserted the wand in her vagina. After a while he put down the wand and fondled plaintiff with his fingers. Plaintiff testified he moved his fingers "around everywhere down there." While fondling plaintiff, Tripoli said he needed to excite her to get a good view of the baby. Plaintiff found the touching uncomfortable, but Tripoli testified he thought she was getting pleasure from it because she said it tickled. Tripoli eventually stopped molesting plaintiff and returned her to the emergency room.

At the time of the misconduct, plaintiff thought it was part of a "regular procedure," albeit "kind of weird." Later that day, however, she began to

---

[1]Tripoli's deposition testimony was inconsistent as to whether the door to the ultrasound room was open or closed; although he testified he usually left the door slightly open, and did so on this occasion, he also testified the room door's magnetic latch was not working properly, and the door closed instead of remaining ajar.

suspect Tripoli's actions were improper, a suspicion confirmed the next morning when she talked to her regular obstetrician. Tripoli was criminally prosecuted and pleaded no contest to a felony charge arising out of his molestation of plaintiff.

Plaintiff's suit named Tripoli, Hospital and others as defendants, and contained causes of action for professional negligence, battery and intentional and negligent infliction of emotional harm. In opposition to Hospital's motion for summary judgment, plaintiff maintained triable issues of fact existed as to whether Hospital was vicariously liable for the battery as a tort committed within the scope of Tripoli's employment, or was directly liable for its own negligence in failing to have a third person present during the examination. The superior court granted the summary judgment motion, rejecting both arguments.

The Court of Appeal reversed. The court relied only on the theory of respondeat superior and expressly declined to reach the question of Hospital's negligence. We granted Hospital's petition for review in order to decide the vicarious liability question.

## DISCUSSION

### I. *Review of Pertinent Law on Respondeat Superior*

■ The rule of respondeat superior is familiar and simply stated: an employer is vicariously liable for the torts of its employees committed within the scope of the employment. (*Perez* v. *Van Groningen & Sons, Inc.* (1986) 41 Cal.3d 962, 967 [227 Cal.Rptr. 106, 719 P.2d 676].)[2] Equally well established, if somewhat surprising on first encounter, is the principle that an employee's willful, malicious and even criminal torts may fall within the scope of his or her employment for purposes of respondeat superior, even

[2]Civil Code section 2338, which has been termed a codification of the respondeat superior doctrine (*Rodgers* v. *Kemper Constr. Co.* (1975) 50 Cal.App.3d 608, 618, fn. 2 [124 Cal.Rptr. 143]), is not limited to employer and employee but speaks more broadly of agent and principal; it makes the principal liable for negligent and "wrongful" acts committed by the agent "in and as part of the transaction of such [agency] business."

Tripoli was not formally employed by Hospital, but by Mediq Imaging Services, Inc., with which Hospital contracted for his services. Hospital, however, concedes it did not seek summary judgment on the ground Tripoli was not its employee, did not argue that issue in the Court of Appeal, and does not rely on it in this court. For purposes of reviewing the ruling on summary judgment, therefore, we will treat Tripoli as Hospital's employee, without considering or deciding whether Tripoli was Hospital's nonemployee agent or ostensible agent (see *Quintal* v. *Laurel Grove Hospital* (1964) 62 Cal.2d 154, 167-168 [41 Cal.Rptr. 577, 397 P.2d 161]) or a special employee for whose torts Hospital is liable under the "borrowed servant" rule (see *Societa per Azioni de Navigazione Italia* v. *City of Los Angeles* (1982) 31 Cal.3d 446, 455-456 [183 Cal.Rptr. 51, 645 P.2d 102]).

though the employer has not authorized the employee to commit crimes or intentional torts. (*Mary M.* v. *City of Los Angeles* (1991) 54 Cal.3d 202, 209 [285 Cal.Rptr. 99, 814 P.2d 1341]; *John R.* v. *Oakland Unified School Dist.* (1989) 48 Cal.3d 438, 447 [256 Cal.Rptr. 766, 769 P.2d 948]; *Carr* v. *Wm. C. Crowell Co.* (1946) 28 Cal.2d 652, 654 [171 P.2d 5].) What, then, is the connection required between an employee's intentional tort and his or her work so that the employer may be held vicariously liable?

It is clear, first of all, that California no longer follows the traditional rule that an employee's actions are within the scope of employment only if motivated, in whole or part, by a desire to serve the employer's interests. (See Rest.2d Agency, § 228, subd. 1(c) [conduct must be "actuated, at least in part, by a purpose to serve the master"].) Our departure from that limiting rule dates at least from the leading case of *Carr* v. *Wm. C. Crowell Co.*, *supra*, 28 Cal.2d 652.

In *Carr*, this court held a building contractor liable for injuries caused when an employee, angry at a subcontractor's employee for interfering in his work, threw a hammer at the other worker's head. We rejected the defendant's claim its employee was not acting within the scope of employment because he "could not have intended by his conduct to further" the employer's interests: *"It is sufficient, however, if the injury resulted from a dispute arising out of the employment. . . . 'It is not necessary that the assault should have been made "as a means, or for the purpose of performing the work he (the employee) was employed to do."'"* (28 Cal.2d at p. 654, quoting *Hiroshima* v. *Pacific Gas & Elec. Co.* (1936) 18 Cal.App.2d 24, 28 [63 P.2d 340], italics added; accord, *Fields* v. *Sanders* (1947) 29 Cal.2d 834, 839 [180 P.2d 684, 172 A.L.R. 525] [that tortious act "was not committed in order to further the interests of the principal" does not preclude vicarious liability]; *Perez* v. *Van Groningen & Sons, Inc.*, *supra*, 41 Cal.3d at p. 969 ["The plaintiff need not demonstrate that the assault was committed for the purpose of accomplishing the employee's assigned tasks."]; *Rodgers* v. *Kemper Constr. Co.*, *supra*, 50 Cal.App.3d at p. 621 ["[T]he 'motive test,' though still the 'majority rule,' has been abandoned in California."].)[3]

While the employee thus need not have intended to further the employer's interests, the employer will not be held liable for an assault or other intentional tort that did not have a causal nexus to the employee's work. This

---

[3]See also *Ira S. Bushey & Sons, Inc.* v. *United States* (2d Cir. 1968) 398 F.2d 167, 171 (discussing "inadequacy" of the motivation-to-serve test generally); LeGrand & Leonard, *Civil Suits for Sexual Assault: Compensating Rape Victims* (1979) 8 Golden Gate L.Rev. 479, 507 (the "motive-benefit" test, which would preclude respondeat superior liability for most sexual assaults, has been "abandoned" in California).

rule, too, can be traced to *Carr* v. *Wm. C. Crowell Co.*, *supra*, 28 Cal.2d 652. There the court acknowledged that "[i]f an employee inflicts an injury out of personal malice, *not engendered by the employment*, the employer is not liable." (*Id.* at p. 656, italics added.) We further explained that in the case under consideration the attack was, indeed, "an outgrowth" of the employee's work: "Not only did the altercation leading to the injury arise solely over the performance of [the employee's] duties, but his entire association with plaintiff arose out of his employment on the building under construction." (*Id.* at p. 657.)

In *Rodgers* v. *Kemper Constr. Co.*, *supra*, 50 Cal.App.3d 608, 614-616, off-duty employees, who had been drinking beer at the jobsite, assaulted workers for another contractor after requesting and being refused a ride on a bulldozer driven by one of the victims. Applying the analysis developed in *Carr* v. *Wm. C. Crowell Co.*, *supra*, the Court of Appeal found substantial evidence the attack—in which the victims were seriously injured and permanently disabled—was within the scope of the assailants' employment. The assailants and victims, the court noted, were "complete strangers" until their work brought them together; thus the dispute could not have derived from "personal malice unrelated to the employment." (50 Cal.App.3d at p. 621.) Rather, a work-related dispute was the "proximate cause" of the attack. (*Ibid.*)

Because an intentional tort gives rise to respondeat superior liability only if it was engendered by the employment, our disavowal of motive as a singular test of respondeat superior liability does not mean the employee's motive is irrelevant. An act serving only the employee's personal interest is less likely to arise from or be engendered by the employment than an act that, even if misguided, was intended to serve the employer in some way.

██  The nexus required for respondeat superior liability—that the tort be engendered by or arise from the work—is to be distinguished from "but for" causation.[4] That the employment brought tortfeasor and victim together in time and place is not enough. We have used varied language to describe the nature of the required additional link (which, in theory, is the same for intentional and negligent torts): the incident leading to injury must be an "outgrowth" of the employment (*Carr* v. *Wm. C. Crowell Co.*, *supra*, 28 Cal.2d 652, 657); the risk of tortious injury must be " 'inherent in the working environment' " (*id.* at p. 656) or " 'typical of or broadly incidental to the enterprise [the employer] has undertaken' " (*Hinman* v. *Westinghouse Elec. Co.* (1970) 2 Cal.3d 956, 960 [88 Cal.Rptr. 188, 471 P.2d 988]).

[4]The distinction is reflected in the common meaning of "engender": "to bring into being." (Webster's New World Dict. (3d college ed. 1991) p. 450.)

Looking at the matter with a slightly different focus, California courts have also asked whether the tort was, in a general way, foreseeable from the employee's duties. Respondeat superior liability should apply only to the types of injuries that " 'as a practical matter are sure to occur in the conduct of the employer's enterprise.' " (*Hinman* v. *Westinghouse Elec. Co.*, *supra*, 2 Cal.3d at p. 959.) The employment, in other words, must be such as predictably to create the risk employees will commit intentional torts of the type for which liability is sought.

In what has proved an influential formulation, the court in *Rodgers* v. *Kemper Constr. Co.*, *supra*, 50 Cal.App.3d at page 618, held the tortious occurrence must be "a generally foreseeable consequence of the activity." In this usage, the court further explained, foreseeability "merely means that in the context of the particular enterprise an employee's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business." (*Id.* at p. 619; accord, *John R.* v. *Oakland Unified School Dist.*, *supra*, 48 Cal.3d at p. 450, fn. 9; *Perez* v. *Van Groningen & Sons, Inc.*, *supra*, 41 Cal.3d at p. 968; *Martinez* v. *Hagopian* (1986) 182 Cal.App.3d 1223, 1228 [227 Cal.Rptr. 763]; *Alma W.* v. *Oakland Unified School Dist.* (1981) 123 Cal.App.3d 133, 141-142 [176 Cal.Rptr. 287].) The *Rodgers* foreseeability test is useful "because it reflects the central justification for respondeat superior [liability]: that losses fairly attributable to an enterprise—those which foreseeably result from the conduct of the enterprise—should be allocated to the enterprise as a cost of doing business." (*Farmers Ins. Group* v. *County of Santa Clara* (1995) 11 Cal.4th 992, 1004 [47 Cal.Rptr.2d 478, 906 P.2d 440].)

■ "Ordinarily, the determination whether an employee has acted within the scope of employment presents a question of fact; it becomes a question of law, however, when 'the facts are undisputed and no conflicting inferences are possible.' " (*Mary M.* v. *City of Los Angeles*, *supra*, 54 Cal.3d at p. 213.) Neither plaintiff nor Hospital has pointed to factual disputes that would prevent us in this case from deciding the applicability of respondeat superior as a matter of law.

## II. *Application to This Case*

■ Was Tripoli's sexual battery of Lisa M. within the scope of his employment? The injurious events were causally related to Tripoli's employment as an ultrasound technician in the sense they would not have occurred had he not been so employed. Tripoli's employment as an ultrasound technician provided the opportunity for him to meet plaintiff and to be alone with her in circumstances making the assault possible. The employment was

thus one necessary cause of the ensuing tort. But, as previously discussed, in addition to such "but for" causation, respondeat superior liability requires the risk of the tort to have been engendered by, "typical of or broadly incidental to," or, viewed from a somewhat different perspective, "a generally foreseeable consequence of," Hospital's enterprise. (*Hinman* v. *Westinghouse Elec. Co.*, *supra*, 2 Cal.3d at p. 960; *Rodgers* v. *Kemper Constr. Co.*, *supra*, 50 Cal.App.3d at p. 618.)

At the broadest level, Hospital argues sex crimes are never foreseeable outgrowths of employment because they, unlike instances of nonsexual violence, are not the product of "normal human traits." Hospital urges us not to "legitimize" sexual misconduct by treating it on a par with mere fights. These generalized distinctions are not, however, compelling. Neither physical violence nor sexual exploitation is legitimate, excusable or routinely expected in the workplace. In *Carr* v. *Wm. C. Crowell Co.*, *supra*, 28 Cal.2d 652, this court did not "legitimize" the act of the construction worker who, on trivial provocation, threw a carpenter's hammer at the plaintiff, "striking him on the head and seriously injuring him" (*id.* at p. 653), any more than we excused, condoned or otherwise "legitimized" a police officer's forcible rape of a detainee in *Mary M.* v. *City of Los Angeles*, *supra*, 54 Cal.3d 202. Nor did the Court of Appeal in *Rodgers* v. *Kemper Constr. Co.*, *supra*, 50 Cal.App.3d 608, 615-616, indicate any inclination to approve of or excuse the intoxicated off-duty workers' brutal attack on two other workers— kicking and beating them with fists, rocks and a hardhat, rendering one unconscious and permanently injuring the other's eyesight. The references in certain cases to " 'the faults and derelictions of human beings' " (*Carr* v. *Wm. C. Crowell Co.*, *supra*, 28 Cal.2d at p. 656) and "normal human traits" (*Rodgers* v. *Kemper Constr. Co.*, *supra*, 50 Cal.App.3d at p. 622) thus must be taken in context to include not only minor character flaws, but also the human tendency toward malice and viciousness. We are not persuaded that the roots of sexual violence and exploitation are in all cases so fundamentally different from those other abhorrent human traits as to allow a conclusion sexual misconduct is per se unforeseeable in the workplace.

Focusing more specifically on the type of sexual assault occurring here, we ask first whether the technician's acts were "engendered by" or an "outgrowth" of his employment. (*Carr* v. *Wm. C. Crowell Co.*, *supra*, 28 Cal.2d at pp. 656-657.) They were not.

Nonsexual assaults that were not committed to further the employer's interests have been considered outgrowths of employment if they originated in a work-related dispute. (E.g., *Fields* v. *Sanders*, *supra*, 29 Cal.2d at pp. 839-840 [employee truck driver's assault on another motorist following

dispute over employee's driving]; see, generally, *Farmers Ins. Group* v. *County of Santa Clara, supra,* 11 Cal.4th 992, 1006.) "Conversely, vicarious liability [has been] deemed inappropriate where the misconduct does not arise from the conduct of the employer's enterprise but instead arises out of a personal dispute (e.g., *Monty* v. *Orlandi* (1959) 169 Cal.App.2d 620, 624 [337 P.2d 861] [bar owner not vicariously liable where on-duty bartender assaulted plaintiff in the course of a personal dispute with his common law wife]), or is the result of a personal compulsion (e.g., *Thorn* v. *City of Glendale* (1994) 28 Cal.App.4th 1379, 1383 [35 Cal.Rptr.2d 1] [city not vicariously liable where fire marshal set business premises on fire during an inspection].)" (*Farmers Ins. Group* v. *County of Santa Clara, supra,* 11 Cal.4th 992, 1006.)

As with these nonsexual assaults, a sexual tort will not be considered engendered by the employment unless its motivating emotions were fairly attributable to work-related events or conditions. Here the opposite was true: a technician simply took advantage of solitude with a naive patient to commit an assault for reasons unrelated to his work. Tripoli's job was to perform a diagnostic examination and record the results. The task provided no occasion for a work-related dispute or any other work-related emotional involvement with the patient. The technician's decision to engage in conscious exploitation of the patient did not *arise out of* the performance of the examination, although the circumstances of the examination made it possible. "If . . . the assault was not motivated or triggered off by anything in the employment activity but was the result of only propinquity and lust, there should be no liability." (*Lyon* v. *Carey* (D.C. Cir. 1976) 533 F.2d 649, 655 [174 App.D.C. 422].)

Our conclusion does not rest on mechanical application of a motivation-to-serve test for intentional torts, which would bar vicarious liability for virtually all sexual misconduct. (See *ante*, p. 297.)[5] Tripoli's criminal actions were, of course, unauthorized by Hospital and were not motivated by any desire to serve Hospital's interests. Beyond that, however, his motivating emotions were not causally attributable to his employment. The flaw in

---

[5]Because we do not apply a motivation-to-serve test as the sole standard of vicarious liability, our rationale differs from that of most other courts that have considered factually similar cases, although several courts have reached the same result as we do: sexual assault by a medical technician is not within the scope of employment. (Compare *Hendley* v. *Springhill Memorial Hosp.* (Ala. 1990) 575 So.2d 547, 551 [technician " 'acted from wholly personal motives' "], *Mataxas* v. *North Shore University Hosp.* (1995) 211 A.D.2d 762 [621 N.Y.S.2d 683, 684] [radiology technician's molestation of patient "committed . . . for purely personal motives"], and *Taylor* v. *Doctors Hosp. (West)* (1985) 21 Ohio App.3d 154 [486 N.E.2d 1249, 1251] [radiology orderly's sexual assault on patient committed "from intensely personal motives" and "in no way served to further or promote the business of the employer-hospital"], with *Samuels* v. *Southern Baptist Hosp.* (La.Ct.App. 1992) 594 So.2d 571, 574 [vicarious liability imposed for rape of patient by nursing assistant] and *Stropes* v. *Heritage House*

plaintiff's case for Hospital's respondeat superior liability is not so much that Tripoli's actions were personally motivated, but that those personal motivations were not generated by or an outgrowth of workplace responsibilities, conditions or events.

Analysis in terms of foreseeability leads to the same conclusion. An intentional tort is foreseeable, for purposes of respondeat superior, only if *"in the context of the particular enterprise* an employee's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business." (*Rodgers* v. *Kemper Constr. Co., supra,* 50 Cal.App.3d at p. 619, italics added.) The question is not one of statistical frequency, but of a relationship between the nature of the work involved and the type of tort committed. The employment must be such as predictably to create the risk employees will commit intentional torts of the type for which liability is sought.

In arguing Tripoli's misconduct was generally foreseeable, plaintiff emphasizes the physically intimate nature of the work Tripoli was employed to perform. In our view, that a job involves physical contact is, by itself, an insufficient basis on which to impose vicarious liability for a sexual assault. (Accord, *Boykin* v. *District of Columbia* (App.D.C. 1984) 484 A.2d 560, 562 "[[T]hat physical touching was necessarily a part of the teacher-student relationship" held insufficient to impose liability on employer for teacher's molestation of deaf and blind student, who could be taught only through touch].) To hold medical care providers strictly liable for deliberate sexual assaults by every employee whose duties include examining or touching patients' otherwise private areas would be virtually to remove scope of employment as a limitation on providers' vicarious liability. In cases like the present one, a deliberate sexual assault is fairly attributed not to any peculiar aspect of the health care enterprise, but only to "propinquity and lust" (*Lyon* v. *Carey, supra,* 533 F.2d 649, 655).[6]

Here, there is no evidence of emotional involvement, either mutual or unilateral, arising from the medical relationship. Although the procedure

---

*Childrens Ctr.* (Ind. 1989) 547 N.E.2d 244, 249-250 [same for molestation of disabled child by nurse's aide].)

[6]We part company at this point with the dissenting justices, who would hold summary judgment improper because either the patient's vulnerability or the intimate physical contact inherent in the examination might have encouraged or incited Tripoli to assault her. On the present record, such inferences would be wholly speculative. Lacking evidence the assault was a product of the therapeutic relationship, to impose vicarious liability on a hospital for a technician's deliberate sexual assault on a patient would stretch the rationale of respondeat superior too far. To do so would make the hospital potentially liable, irrespective of its actual fault, whenever an employee used force, coercion or trickery to exploit criminally a patient's physical or psychological vulnerability, vulnerability that is characteristic of hospitalized patients generally. An analysis that, in the field of health care, deems a conscious sexual assault to have arisen from the employment *simply because* the patient involved was vulner-

ordered involved physical contact, it was not of a type that would be expected to, or actually did, give rise to intense emotions on either side. We deal here not with a physician or therapist who becomes sexually involved with a patient as a result of mishandling the feelings predictably created by the therapeutic relationship (see, e.g., *Simmons* v. *United States* (9th Cir. 1986) 805 F.2d 1363, 1369-1370; *Doe* v. *Samaritan Counseling Center* (Alaska 1990) 791 P.2d 344, 348-349), but with an ultrasound technician who simply took advantage of solitude, access and superior knowledge to commit a sexual assault.[7]

Although the routine examination Tripoli was authorized to conduct involved physical contact with Lisa M., Tripoli's assault on plaintiff did not originate with, and was not a generally foreseeable consequence of, that contact. Nothing happened during the course of the prescribed examinations to provoke or encourage Tripoli's improper touching of plaintiff. (See *Alma W.* v. *Oakland Unified School Dist.*, *supra*, 123 Cal.App.3d at p. 141 [contrasting assault cases, in which a work-related quarrel preceded the assault, with school custodian's rape of student, which was held unrelated to custodian's duties]; *Wiersma* v. *City of Long Beach* (1940) 41 Cal.App.2d 8, 11, 15 [106 P.2d 45] [producer of wrestling exhibition not vicariously liable for injuries caused by wrestler who "suddenly and, apparently without provocation," attacked spectator].) The assault, rather, was the independent product of Tripoli's aberrant decision to engage in conduct unrelated to his duties. In the pertinent sense, therefore, Tripoli's actions were not foreseeable from the nature of the work he was employed to perform.

Plaintiff contends the battery in this case, like the police officer's rape of a detainee in *Mary M.* v. *City of Los Angeles*, *supra*, 54 Cal.3d 202, "arose from an abuse of job-created authority." More accurately, Tripoli abused his position of *trust*, since he had no legal or coercive authority over plaintiff. Assuming an analogy can be fully maintained between authority and trust,

___

able, surrendered his or her privacy or submitted to physical contact unusual for strangers in a nonmedical context, would, in effect, expose health care providers to potential liability without fault for sexual assault by virtually any employee on any patient.

[7]The American Medical Association has described and distinguished two broad types of sexual misconduct by physicians: first, misconduct arising from the physician's inability properly to contain and control his or her emotional involvement with the patient; and second, conscious exploitation of the physician's status, knowledge and power to coerce or trick the patient into allowing sexual contact. (American Medical Association, Council on Ethical and Judicial Affairs, Council Rep., *Sexual Misconduct in the Practice of Medicine* (1991) 266 JAMA 2741-2742.) Tripoli, of course, was a technician rather than a physician. In any event, his conduct belongs in the second category—conscious exploitation—and we need not decide here whether sexual misconduct of the first type might, under some circumstances, create respondeat superior liability on the employer's part.

*Mary M.* still provides less than compelling precedent for liability here. In *Mary M.*, we held a police officer's assault was a generally foreseeable consequence of his position. "In view of the considerable power and authority that police officers possess, it is neither startling nor unexpected that on occasion an officer will misuse that authority by engaging in assaultive conduct." (*Mary M.* v. *City of Los Angeles, supra,* 54 Cal.3d at p. 217.) We expressly limited our holding: "We stress that our conclusion in this case flows from the unique authority vested in police officers. Employees who do not have this authority and who commit sexual assaults may be acting outside the scope of their employment as a matter of law." (*Id.* at p. 218, fn. 11.)

While a police officer's assault may be foreseeable from the scope of his unique authority over detainees, we are unable to say the same of an ultrasound technician's assault on a patient. Hospital did not give Tripoli any power to exercise general control over plaintiff's liberty. He was not vested with any coercive authority, and the trust plaintiff was asked to place in him was limited to conduct of an ultrasound examination. His subsequent battery of the patient was independent of the narrow purpose for which plaintiff was asked to trust him. Whatever costs may be fairly attributable to a police officer's public employer in light of the extraordinary scope of authority the community, for its own benefit, confers on the officer, we believe it would not be fair to attribute to Hospital, which employed Tripoli simply to conduct ultrasound examinations, the costs of a deliberate, independently motivated sexual battery unconnected to the prescribed examination.

In reaching our conclusion we have consulted the three identified policy goals of the respondeat superior doctrine—preventing future injuries, assuring compensation to victims, and spreading the losses caused by an enterprise equitably—for additional guidance as to whether the doctrine *should* be applied in these circumstances. (See *Mary M.* v. *City of Los Angeles, supra,* 54 Cal.3d at pp. 209, 214-217; *John R.* v. *Oakland Unified School Dist., supra,* 48 Cal.3d at pp. 451-452.) In this case, however, we have drawn no firm direction from consideration of the first two policy goals. Although imposition of vicarious liability would likely lead to adoption of some further precautionary measures, we are unable to say whether the overall impact would be beneficial to or destructive of the quality of medical care. Hospital and its amici curiae predict imposition of respondeat superior liability would lead health care providers to overreact by monitoring, for possible sexual misconduct, every interaction between patient and health care worker. Published research, on the other hand, indicates providers have

available several other approaches to preventing sexual misconduct by employees.[8]

As for ensuring compensation, the briefing does not enable us to say with confidence whether or not insurance is actually available to medical providers for sexual torts of employees and, if so, whether coverage for such liability would drastically increase the insurance costs—or, if not, the uninsured liability costs—of nonprofit providers such as Hospital.[9] The second policy consideration is therefore also of uncertain import here; imposing vicarious liability is likely to provide additional compensation to some victims, but the consequential costs of ensuring compensation in this manner are unclear.

Third and finally, we attempt to assess the propriety of spreading the risk of losses among the beneficiaries of the enterprise upon which liability would be imposed. As Hospital points out, this assessment is another way of asking whether the employee's conduct was "so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business." (*Rodgers* v. *Kemper Constr. Co.*, *supra*, 50 Cal.App.3d at p. 619.) For reasons already discussed, we conclude the connection between Tripoli's employment duties—to conduct a diagnostic examination—and his independent commission of a deliberate sexual assault was too attenuated, without proof of Hospital's negligence, to support allocation of plaintiff's losses to Hospital as a cost of doing business. Consideration of the respondeat superior doctrine's basis in public policy, therefore, does not alter our conviction that an ultrasound technician's sexual assault on a patient is not a risk predictably created by or fairly attributed to the nature of the technician's employment.

---

[8]See Jorgenson, *Employer / Supervisor Liability and Risk Management*, in Breach of Trust: Sexual Exploitation by Health Care Professionals and Clergy (Gonsiorek edit. 1995) pages 296-297; Schoener, *Liability and Risk: An Administrator's View*, in *id.* at pages 305-315; American Medical Association, Council on Ethical and Judicial Affairs, *supra*, 266 JAMA at pages 2744-2745; Plaut et al., *Roles of the Health Professional in Cases Involving Sexual Exploitation of Patients*, in Sexual Exploitation of Patients by Health Professionals (Burgess et al. edit. 1986) pages 20-23.

[9]Whether a health care professional's sexual misconduct is covered under the professional's malpractice policy is "a much litigated issue," depending in part on the exact factual relationship between the misconduct and the professional services for which the professional was engaged. (Louisell & Williams, 4 Medical Malpractice (1994) § 20.03[1], p. 20-36.) But even where the misconduct is not sufficiently related to the provision of professional services to be covered under malpractice insurance, the hospital or other institutional provider may be covered for *its* vicarious liability under a commercial general liability policy. (*Id.,* § 20.01, p. 20-11.) Neither Insurance Code section 533 nor related policy exclusions for intentionally caused injury or damage preclude a California insurer from indemnifying an employer held vicariously liable for an employee's willful acts. (*Arenson* v. *Nat. Automobile & Cas. Ins. Co.* (1955) 45 Cal.2d 81, 83-84 [286 P.2d 816]; *Fireman's Fund Ins. Co.* v. *City of Turlock* (1985) 170 Cal.App.3d 988, 1000-1001 [216 Cal.Rptr. 796].)

Although, as we have concluded, Tripoli's criminal acts were not engendered by or broadly incidental to his work so as to render Hospital vicariously liable, Hospital's duty of due care to its patient obliged it to take all measures dictated by ordinary prudence to protect against even such unusual sources of injury. The Court of Appeal declined to decide whether plaintiff's cause of action for negligence could survive summary judgment. The court therefore did not decide whether Hospital fulfilled its duty of care under the circumstances nor did it resolve any issue as to the adequacy of, or necessity for, plaintiff's expert declaration. Consequently, we consider it appropriate to remand the matter to the Court of Appeal for decision in the first instance on plaintiff's negligence cause of action.

## CONCLUSION

Hospital employed a technician to conduct ultrasound examinations. The technician, after completing such an examination of plaintiff, took advantage of plaintiff's trust and his own superior knowledge to commit on her a deliberate sexual battery. His reasons for doing so did not derive from any events or conditions of his employment, nor were his actions provoked by anything that occurred during the prescribed examination. Hospital, by employing the technician and providing the ultrasound room, may have set the stage for his misconduct, but the script was entirely of his own, independent invention. For this reason it would be unfair and inconsistent with the basic rationale of respondeat superior to impose liability on Hospital irrespective of its own negligence.

The judgment of the Court of Appeal is reversed and the matter is remanded to that court for further proceedings consistent with this opinion.

Lucas, C. J., Arabian, J., Baxter, J., and George, J., concurred.

**GEORGE, J.,** Concurring.—I concur in the result and reasoning of the majority, and I have signed the majority opinion. I write separately because, for the reasons expressed in my concurring opinion in *Farmers Ins. Group* v. *County of Santa Clara* (1995) 11 Cal.4th 992 [47 Cal.Rptr.2d 478, 906 P.2d 440], I would go further and overrule the decision in *Mary M.* v. *City of Los Angeles* (1991) 54 Cal.3d 202 [285 Cal.Rptr. 99, 814 P.2d 1341].

Lucas, C. J., concurred.

**MOSK, J.**—I dissent. Justice Kennard demonstrates that the Court of Appeal's decision is without error and hence that its judgment should be affirmed. I join in her opinion.

I write separately to emphasize the unsoundness of the majority's reasoning and the incorrectness of their result.

In its narrowest scope, the doctrine of respondeat superior declares that "the employer's responsibility for the torts of his employee extends beyond his actual or possible control of the servant to injuries which are 'risks of the enterprise.'" (*Hinman* v. *Westinghouse Elec. Co.* (1970) 2 Cal.3d 956, 960 [88 Cal.Rptr. 188, 471 P.2d 988].) For its firmest basis, the doctrine rests on the premise that such injuries are costs that the employer's business imposes on the community—costs that the employer may equitably be required to avoid if he can or to cover if he cannot: "'We are not here looking for the master's fault but rather for risks that may fairly be regarded as typical of or broadly incidental to the enterprise he has undertaken. . . . Further, we are not looking for that which can and should reasonably be avoided, but with the more or less inevitable toll of a lawful enterprise.'" (*Ibid.*, quoting 2 Harper & James, The Law of Torts (1956) pp. 1376-1377.)

The majority recognize, as they must, that "[n]onsexual assaults" come within the doctrine of respondeat superior "if they originate[] in a work-related dispute," as when an "employee truck driver[] assault[s] . . . another motorist following [a] dispute over [the] employee's driving." (Maj. opn., *ante*, at p. 300.) Such an attack, of course, falls beyond the doctrine's bounds if "'the misconduct . . . arises out of a personal dispute,'" as when an "'on-duty bartender assault[s] [a bystander] in the course of a personal dispute [between the bartender and] his common law wife . . . .'" (Maj. opn., *ante*, at p. 301, quoting *Farmers Ins. Group* v. *County of Santa Clara* (1995) 11 Cal.4th 992, 1006 [47 Cal.Rptr.2d 478, 906 P.2d 440].)

It follows that sexual assaults are within the doctrine of respondeat superior if they originate in work-related concupiscence, as when "a physician or therapist . . . becomes sexually involved with a patient as a result of mishandling the feelings predictably created by the therapeutic relationship . . . ." (Maj. opn., *ante*, at p. 303.) Similarly, an attack of this sort is outside the doctrine's limits if the impropriety springs from a particularized lust, as when a meat cutter makes a sexual advance on a customer as he fills an order. (*Great Atlantic & Pacific Tea Co.* v. *Lantrip* (1934) 26 Ala.App. 79 [153 So. 296, 298] [applying Alabama law].)

In my view, it is at least a question for the trier of fact whether the sexual assault in this cause comes within the doctrine of respondeat superior. The facts are undisputed that, in the course of his employment at Henry Mayo Newhall Memorial Hospital, Bruce Wayne Tripoli, an ultrasound technician, was required to have intimate physical contact with female patients, like Lisa M., which involved the touching of their breasts and the rubbing of their pubic areas—all without a chaperon. The facts are also undisputed that Tripoli had no acquaintance whatever with Lisa apart from the event with

which we are here concerned. In a word, it is certainly arguable that the itch that Tripoli improperly scratched arose from intimate physical contact that was altogether proper to his work. The majority claim to discern a particularized lust rather than work-related concupiscence. They blink reality. Worse still, they ignore the undisputed facts. The "[h]ospital," they admit, "may have set the stage for [Tripoli's] misconduct . . . ." (Maj. opn., *ante*, at p. 19.) "[B]ut the script," they assert "was entirely of his own, independent invention." (*Ibid.*) On that point, perhaps they are right. They are wrong, however, in refusing to acknowledge that his inspiration arose from the mise-en-scène established by the hospital.[1]

In conclusion, having found no error in the Court of Appeal's decision, I would affirm its judgment.

**KENNARD, J.**—I dissent.

The majority holds that, *as a matter of law*, a hospital employee was not acting within the scope of his employment when he sexually molested a pregnant woman while purportedly conducting an ultrasound examination necessitating that he have physical contact with intimate areas of the woman's body. I disagree. Scope of employment in this case, as in most cases, is a question of fact to be resolved by the trier of fact.

The scope-of-employment question presented here is very similar to one this court addressed just a few weeks ago in *Farmers Ins. Group v. County of Santa Clara* (1995) 11 Cal.4th 992 [47 Cal.Rptr.2d 478, 906 P.2d 440]. In that case, an employee had sexually harassed coemployees, whereas here an employee sexually assaulted a nonemployee, but both cases pose the question whether an employee's on-the-job sexual misconduct arises in the scope of employment. In *Farmers,* as here, the majority concluded, as a matter of law, that the sexual misconduct was outside the scope of employment. In *Farmers,* as here, I have concluded that because reasonable minds may differ as to the proper resolution of the issue, it should not be resolved as a matter of law.

---

[1]The unfortunate but inevitable result of the majority's analysis is to exempt the health care employer, at least in part, from the doctrine of respondeat superior. I merely note that what they call the "three identified policy goals of the respondeat superior doctrine—preventing future injuries, assuring compensation to victims, and spreading the losses caused by an enterprise equitably" (maj. opn., *ante*, at p. 304)—do not justify exemption. Even if application of the doctrine furthers none of these objects, it nevertheless compels the health care employer to avoid or cover the costs his business imposes on the community. "Fairness is served thereby," and the "efficient use of limited resources is furthered." (*Smiley* v. *Citibank* (1995) 11 Cal.4th 138, 161 [44 Cal.Rptr.2d 441, 900 P.2d 690].)

## I

Plaintiff Lisa M., injured in a fall, went to defendant Henry Mayo Newhall Memorial Hospital for treatment. Because plaintiff was pregnant, the emergency room physician ordered an obstetrical ultrasound examination to determine whether the fetus had been injured. The ultrasound technician, Bruce Tripoli, rejected plaintiff's request that her mother and boyfriend be present during the procedure. Plaintiff was wearing shorts and a maternity top (the hospital did not provide a gown), and she raised her top and pulled down her shorts so that Tripoli could perform the examination. Tripoli rubbed a gel on plaintiff's abdomen, going as low as one inch below the pubic hairline; he then pressed the ultrasound wand against her abdomen. He also raised plaintiff's right breast to place the wand in the area below it; he did this with the back of his hand, through a towel.

After the examination, Tripoli left the room. Moments later, he returned and asked plaintiff if she would like to know the sex of her baby. Plaintiff said she would; with plaintiff's cooperation, Tripoli pulled down plaintiff's shorts to perform the examination. Tripoli coated the ultrasound wand with gel, and rubbed it around and inside plaintiff's vagina. Tripoli then fondled her with his fingers, telling her that he needed to sexually excite her to stop the baby from moving. An ultrasound procedure to determine the sex of a fetus does not, however, require touching of the vagina, vaginal insertion of the ultrasound wand, or sexual excitation of the patient. Plaintiff did not object to Tripoli's improper touching because she was unsure whether or not his acts were a necessary part of the examination. The next day, after discussing the matter with her sister and her obstetrician, plaintiff concluded that she had been molested. Tripoli was arrested, and was later convicted of a felony arising from his sexual assault on plaintiff.

Plaintiff sued Tripoli and his employer, defendant hospital;[1] as to the latter she asserted that (1) defendant was vicariously liable for Tripoli's tortious conduct, and (2) defendant was negligent in not providing her with a hospital gown and a female observer during the ultrasound examination. Defendant hospital moved for summary judgment, contending that it was not vicariously liable because Tripoli had not acted in the course of his employment when he molested plaintiff, that plaintiff had failed to produce evidence that it had acted negligently, and that it was not negligent as a matter

---

[1]In this case, ultrasound technician Tripoli was not directly employed by defendant; he worked for Mediq Imaging Services, Inc. (a codefendant in this case), with which defendant contracted for Tripoli's services. Defendant, however, does not rely on the absence of a direct employment relationship between it and Tripoli as a basis to avoid vicarious liability in this case, and both parties have litigated the issue on the assumption that defendant is, for all intents and purposes, Tripoli's employer. Accordingly, like the majority (see maj. opn., *ante*, at p. 296, fn. 2), I have treated defendant as Tripoli's employer.

of law. The trial court granted defendant's motion. The Court of Appeal reversed, holding that whether Tripoli had acted in the scope of employment was a triable issue of fact, and that therefore the trial court should not have granted defendant hospital's motion for summary judgment.[2]

## II

Under the doctrine of respondeat superior, an employer may be held vicariously liable for acts committed by an employee in the scope of employment. (*Mary M.* v. *City of Los Angeles* (1991) 54 Cal.3d 202, 208 [285 Cal.Rptr. 99, 814 P.2d 1341].) In *Farmers Ins. Group* v. *County of Santa Clara, supra,* 11 Cal.4th 992 (hereafter *Farmers*), I summarized the principles governing scope of employment as follows: " ' "A risk arises out of the scope of employment when 'in the context of the particular enterprise an employee's conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business. [Citations.] In other words, where the question is one of vicarious liability, the inquiry should be whether the risk was one "that may fairly be regarded as typical of or broadly incidental" to the enterprise undertaken by the employer. [Citation.]' " ' (*Mary M.* v. *City of Los Angeles, supra,* 54 Cal.3d at p. 209, citing *Perez* v. *Van Groningen & Sons, Inc.* [(1986)] 41 Cal.3d 962, 968 [227 Cal.Rptr. 106, 719 P.2d 676], and *Rodgers* v. *Kemper Constr. Co.* (1975) 50 Cal.App.3d 608, 619 [124 Cal.Rptr. 143], brackets in *Mary M.*) [¶] Acts that do not benefit the employer may nonetheless fall within the scope of employment; so may acts that are willful or malicious, and those that violate the employer's express orders or policies. (*Mary M.* v. *City of Los Angeles, supra,* 54 Cal.3d at p. 209.)" (*Farmers, supra,* 11 Cal.4th 992, 1042 (dis. opn. of Kennard, J.).)

Elaborating upon these principles of respondeat superior, the majority notes that an employee's tortious conduct is within the scope of employment when there is a "causal nexus" between an employee's tortious conduct and the employee's job. (Maj. opn., *ante,* at p. 297.) As the majority explains: "The question is not one of statistical frequency, but of a relationship between the nature of the work involved and the type of tort committed. The

---

[2]Because the Court of Appeal held that the trial court erred in finding that, as a matter of law, plaintiff was not entitled to recover on her cause of action for vicarious liability, it did not address plaintiff's claim that the trial court also erred in finding, as a matter of law, that plaintiff was not entitled to recover on her cause of action for negligence. As a result of the majority's conclusion today that plaintiff may not recover on her claim of vicarious liability, the Court of Appeal must now, on remand, consider the merits of plaintiff's cause of action for negligence. Because I agree with the Court of Appeal that whether ultrasound technician Tripoli had acted within the scope of his employment presents a triable issue of fact, I do not address the merits of plaintiff's cause of action for negligence.

employment must be such as predictably to create the risk employees will commit intentional torts of the type for which liability is sought." (*Id.* at p. 302.) I have no quarrel with this observation. My disagreement stems from the manner in which the majority applies these general principles of respondeat superior to the facts of this case.

### III

The issue in this case is whether the trial court erred when it granted a defendant's motion for summary judgment, concluding as a *matter of law* that ultrasound technician Tripoli's sexual misconduct occurred outside the scope of his employment, and that therefore defendant hospital could not be held vicariously liable for Tripoli's actions. A motion for summary judgment may be granted only when "there is no triable issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).)

As the majority concedes (maj. opn., *ante*, at p. 299), whether an employee's tortious acts are within the scope of employment is in general a question of *fact*. (*John R.* v. *Oakland Unified School Dist.* (1989) 48 Cal.3d 438, 447 [256 Cal.Rptr. 766, 769 P.2d 948]; *Ducey* v. *Argo Sales Co.* (1979) 25 Cal.3d 707, 722 [159 Cal.Rptr. 835, 602 P.2d 755]; *Loper* v. *Morrison* (1944) 23 Cal.2d 600, 605 [145 P.2d 1]; *Westberg* v. *Willde* (1939) 14 Cal.2d 360, 373 [94 P.2d 590].) The majority, however, treats scope of employment in this case as a question of *law*, reasoning that it may do so because the parties have not "pointed to factual disputes that would prevent us in this case from deciding the applicability of respondeat superior as a matter of law." (Maj. opn., *ante*, at p. 299.) Not so.

True, there is no dispute as to the *predicate* facts underlying the question whether ultrasound technician Tripoli acted in the scope of his employment; that is, the parties agree on where, when, and how Tripoli molested plaintiff, and they agree that defendant was Tripoli's employer. (See fn. 2, *ante.*) But the absence of a dispute regarding the *predicate* facts does not necessarily mean that the *ultimate* question—that is, whether Tripoli's conduct fell within the scope of employment—is one of law, to be decided on summary judgment. As I shall explain, whether Tripoli's acts arose within the scope of his employment is itself a disputed factual question, notwithstanding the parties' agreement on the predicate facts.

This court has long held that whether an employee's tortious conduct falls outside of the scope of employment is generally a question of fact, even when the facts underlying that determination are not in dispute. In *Westberg*

v. *Willde, supra,* 14 Cal.2d 360, a truck driver making deliveries for the Reliable Delivery Service stopped at his home for lunch, then left to deliver a letter to his father's place of employment before returning to his office. On the way, he negligently collided with another car, killing the driver. The decedent's heirs sued the owner of the delivery service, contending that the accident occurred in the scope of employment, and that the owner was therefore liable for the damages arising from his employee's negligence. This court affirmed a jury verdict for the plaintiffs, rejecting the defendant's contention that the accident occurred, as a matter of law, outside the scope of employment. The court explained: " 'Whether there has been a deviation so material or substantial as to constitute a complete departure is usually a question of fact. In some cases the deviation may be so marked, and in others so slight relatively, that the court can say that no conclusion other than that the act was or was not a departure could reasonably be supported; while in still others the deviation may be so uncertain in extent and degree in view of the facts and circumstances as to make the question of what inferences should be drawn from the evidence properly one for the jury . . . .' " (*Id.* at p. 373.)

More recent cases, expressing the same principle in shorthand form, have said that scope of employment is a question of fact unless " 'the facts are undisputed and *no conflicting inferences are possible.*' " (*Mary M.* v. *City of Los Angeles, supra,* 54 Cal.3d at p. 213, italics added, quoting *Perez* v. *Van Groningen & Sons, Inc.* (1986) 41 Cal.3d 962, 968 [227 Cal.Rptr. 106, 719 P.2d 676].) In other words, if the parties agree as to the underlying facts, but dispute the inferences as to scope of employment that may reasonably be drawn from those facts, scope of employment is a question of fact. Or, as the court more clearly stated in *Alma W.* v. *Oakland Unified School Dist.* (1981) 123 Cal.App.3d 133, 138 [176 Cal.Rptr. 287]: "Where the facts of the case make it arguable whether the employee has acted within the scope of his employment, then the scope of employment issue is one properly decided by the trier of fact." (See also Rest.2d Agency, § 228, com. d, p. 505 ["The question whether or not the act done is so different from the act authorized that it is not within the scope of the employment is decided by the court if the answer is clearly indicated; otherwise, it is decided by the jury."]; *O'Leary* v. *Brown-Pacific-Maxon* (1950) 340 U.S. 504, 506-508 [95 L.Ed. 483, 486-487, 71 S.Ct. 470] [Whether employee committed an act " 'arising out of and in the course of employment' " is a question of fact under federal workers' compensation law.].)

In this case, as shown below, the parties dispute the inferences that may reasonably be drawn from ultrasound technician Tripoli's conduct when he sexually molested plaintiff; that is, they dispute whether that conduct was so

closely related to the performance of his duties that it may reasonably be inferred that the conduct occurred in the scope of his employment.

The majority asserts that ultrasound technician Tripoli's conduct fell outside the scope of employment because Tripoli molested plaintiff, a patient, for personal reasons unrelated to Tripoli's employment at defendant hospital. In the words of the majority: "[T]here is no evidence [here] of emotional involvement, either mutual or unilateral, arising from the medical relationship" (maj. opn., *ante*, at p. 302), and "[n]othing happened during the course of the prescribed examinations to provoke or encourage Tripoli's improper touching of plaintiff" (*id.* at p. 303). Thus, the majority concludes, Tripoli's sexual assault on plaintiff "is fairly attributed not to any peculiar aspect of the health care enterprise, but only to 'propinquity and lust' [citation]." (*Id.* at p. 302.)

Perhaps. But a trier of fact might also reasonably conclude that Tripoli's employment as an ultrasound technician did have certain "peculiar aspects" that played a not insignificant role in the sexual assault. To perform an ultrasound examination on a pregnant woman, a technician rubs a gel on the woman's exposed lower abdomen. This intimate contact, inherent in the job, put plaintiff in a vulnerable position and permitted Tripoli to dupe plaintiff into believing that his sexual assault was actually part of a standard medical procedure, thereby giving Tripoli a basis to hope that his misconduct would remain undetected. Moreover, it is not unreasonable to infer that the intimate contact inherent in the job contributed to Tripoli's sexual arousal and incited him to engage in the misconduct. In short, a reasonable trier of fact could conclude that this sexual assault would never have occurred had Tripoli been employed by defendant in a capacity other than ultrasound technician, and that therefore the misconduct may fairly be attributed to risks arising from, and inherent in, the "peculiar aspects" of Tripoli's employment. (See *Stropes v. Heritage House Childrens Ctr.* (Ind. 1989) 547 N.E.2d 244 [question of fact whether nurse's aide acted in the scope of employment when he sexually molested severely retarded patient]; *Marston v. Minneapolis Clinic of Psychiatry* (Minn. 1982) 329 N.W.2d 306 [question of fact whether sexual acts by licensed psychologist during "biofeedback" sessions were within scope of employment]; *Samuels v. Southern Baptist Hosp.* (La.Ct.App. 1992) 594 So.2d 571, 574 [upholding as "not clearly wrong" determination that nursing assistant was acting in the scope of his employment when he raped psychiatric patient].)

When an employee's personal motivations are so enmeshed with the employee's performance of occupational duties that reasonable minds can differ as to whether the employee's tortious act is incidental to those duties,

the issue of whether the act arose in the scope of employment should be resolved by the trier of fact, rather than a trial court acting on a motion to dismiss. (Note, *A Matter of Trust: Institutional Employer Liability for Acts of Child Abuse by Employees* (1992) 33 Wm. & Mary L.Rev. 1295, 1316.) Reasonable minds can differ with regard to whether the nexus between Tripoli's tortious conduct and the scope of employment is sufficiently close to conclude that the conduct arose in the scope of employment; therefore, that issue is a question of *fact* to be resolved at trial.

## CONCLUSION

I do not suggest, by the foregoing comments, that the question whether an employee's tortious conduct is within the scope of employment may *never* be resolved on summary judgment. Although scope of employment is ordinarily a question of fact, it becomes a question of law "where the undisputed facts would not support an inference that the employee was acting within the scope of his employment." (*John R.* v. *Oakland Unified School Dist., supra,* 48 Cal.3d at p. 447.) Thus, this court held in *John R.* that, as a matter of law, a junior high school teacher acted outside the scope of his employment when he molested one of his students, and that therefore no liability could be imposed on the school district that employed him. But the converse is also true: when an employee's tortious acts, although personally motivated, are so integrally entwined with his or her employment that reasonable minds can differ as to whether the acts arose in the scope of employment, then scope of employment is a question of fact, rather than one of law, and may not be decided on a motion for summary judgment. This is the case here.

I would affirm the judgment of the Court of Appeal, which held that the trial court erred when it granted plaintiff's motion for summary judgment.