[No. C047659. Third Dist. Feb. 1, 2006.]

LILY KEPHART et al., Plaintiffs and Appellants, v.
GENUITY, INC., Defendant and Respondent.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication
with the exception of parts II–IV.

284

COUNSELCOUNSEL

McManisMcManis Faulkner & Morgan, James McManis, Colleen Duffy Smith, Neda Mansoorian, Matthew Schechter and Jessica Valenzuela Santamaria for Plaintiffs and Appellants.

Matheny Sears Linkert & Long, Eric R. Wiesel and Michael A. Bishop for Defendant and Respondent.

**OPINION**

**SCOTLAND, P. J.**—Plaintiffs Lily Kephart, Huan Kephart, and their children, Jaymar Kephart, Huan Kephart II, and Dylan Kephart, suffered harm when their Toyota 4Runner rolled over after being forced from the road by another driver, Duncan Graham. They sued Graham for damages. They also sued his employer, Genuity, Inc. (Genuity), on the theory that Graham caused the accident while acting in the course and scope of his employment and, therefore, Genuity was vicariously liable for the harm caused by its employee, Graham. In addition, plaintiffs sued Toyota Motor North America, Inc., Toyota Motor Sales, U.S.A., Inc., and Toyota of Santa Cruz, alleging that design defects in the Toyota 4Runner (the Toyota) contributed to the harm suffered by plaintiffs.

Graham settled his civil liability with plaintiffs and was dismissed from the action. The case was then tried before a jury, which returned verdicts in favor of Genuity and the Toyota defendants.

Plaintiffs appeal only from the judgment entered in favor of Genuity. Among other things, they contend the trial court erred in denying their motion for judgment notwithstanding the verdict, which was based on their claim that, as a matter of law, Graham was acting within the course and scope of his employment.

In the published part of this opinion, we conclude that from the evidence presented to it, the jury reasonably could find that Graham's conduct at the time of this incident was motivated entirely by personal malice and did not occur within the course and scope of his employment. In the unpublished part of our opinion, we reject plaintiffs' other claims of error. Accordingly, we shall affirm the judgment.

## FACTS

This litigation arose out of what may fairly be called a road rage incident that occurred around 5:00 p.m., on Sunday, October 17, 1999, on Interstate 205 near Tracy. Various witnesses to the incident had differing perspectives of the event.

Doctor Deena Lenser was on her way to San Francisco to take an examination to become board certified. Her husband was driving while Lenser studied for the examination. Lenser testified that, at some point, she looked up from her reading and saw plaintiffs' Toyota in the left lane. It appeared that the Toyota was being chased by a green Pontiac (the Pontiac).[1] The Pontiac was tailgating the Toyota so closely that it looked like the Pontiac was being towed. They were traveling at about 70 miles per hour. When the Toyota moved to the right lane in a controlled lane change, the Pontiac moved to the right lane behind the Toyota in an aggressive manner. It appeared to Lenser that the driver of the Pontiac was chasing the Toyota and was quite angry. The Toyota moved back to the left lane in a controlled lane change, and the Pontiac pulled alongside the Toyota. Lenser thought the Pontiac would pass the Toyota, but instead the Pontiac swerved into the left lane and forced the Toyota off the roadway. The Pontiac was inches from the Toyota, which had to move or get hit. At some point, all four of the Toyota's wheels were on a gravel and dirt area off of the roadway. The driver of the Toyota accelerated to get around the Pontiac. When he tried to turn back onto the roadway, the Toyota flipped and rolled over a couple of times.

Susan Ryan was driving on Interstate 205 on her way to celebrate her brother's birthday. She testified that, in her rearview mirror, she saw the Toyota and the Pontiac weaving and swerving. It appeared they were fighting with each other or trying to hit and evade each other. Ryan believed the driver of the Pontiac was the aggressor because the Pontiac made more moves toward the Toyota, which appeared to be trying to avoid the Pontiac. Ryan saw the Toyota go completely off the roadway onto the dirt and gravel

---

[1] It was, of course, not the Toyota and the Pontiac but the driver of the Toyota and the driver of the Pontiac who engaged in the conduct to be described. But the witnesses generally described the event in terms of the Toyota doing this and the Pontiac doing that. In relating the testimony, we will adhere to the style of the witnesses.

median. The Toyota began to slide but then straightened out. When the Toyota attempted to get back on the roadway, it went down on its side and then rolled. The Pontiac did not stop, but instead sped away. As it passed Ryan, she wrote down its license number.

Thomas Hendricks testified that he was driving on Interstate 205 toward his mother's house. The Toyota was in the left lane directly in front of him. Hendricks saw the Pontiac enter the right lane of the freeway from an on-ramp. There was a large, slow-moving vehicle ahead in the right lane. The Pontiac accelerated to get ahead of the Toyota and then made an aggressive lane change into the left lane. The driver of the Toyota had to lightly hit his brakes. After the cars passed the slower-moving vehicle, the Toyota made an aggressive lane change into the right lane and pulled alongside the Pontiac. The driver of the Toyota began making hand gestures at the driver of the Pontiac and appeared to be saying or yelling something. The Pontiac's driver appeared to make a hand gesture in return, whereupon the driver of the Toyota then accelerated, made an aggressive lane change in front of the Pontiac, and hit his brakes. This caused the Pontiac to brake. The Pontiac moved to the right lane and looked like it was trying to pass the Toyota. However, the Toyota moved into the right lane and forced the Pontiac onto the shoulder of the road. The Pontiac accelerated and moved back into the right lane and the Toyota moved into the left lane. The Pontiac moved in front of the Toyota, and the driver hit the brakes hard. This caused the driver of the Toyota to brake hard and move off the roadway. When the Toyota moved back to the roadway, it flipped and rolled two or three times. Hendricks followed the Pontiac while he called the California Highway Patrol (CHP) on his cell phone. He provided the CHP with the make and color of the vehicle, its license number, and a description of the driver as seen from behind. When the Pontiac began moving erratically, Hendricks was told not to follow any further.

Plaintiff Lily Kephart testified that her family was returning home to Santa Cruz after visiting family in Elk Grove.[2] Her husband, Huan, was driving their Toyota. When they were in the vicinity of Tracy, Lily turned to look at her children in the backseat and noticed the green Pontiac was just a few feet behind the Toyota. Huan moved the Toyota to the right lane. The Pontiac passed and then moved into the right lane very close in front of the Toyota. Huan moved the Toyota into the left lane and later moved back to the right lane. The next time Lily noticed the Pontiac, it was approaching from behind on the right-hand shoulder. The Pontiac passed the Toyota and then pulled very close in front of it. The driver of the Pontiac slammed on the brakes, and

---

[2] When we hereafter refer to plaintiffs individually, we will use their first names for simplicity and to avoid confusion.

Huan hit the Toyota's brakes and tried to move to the left lane. Lily did not remember much else, except for the Toyota rolling over.

Huan testified that the Pontiac entered the freeway and moved directly into the left lane in front of the Toyota. The driver of the Pontiac then applied its brakes, causing Huan to brake. After passing a slow-moving truck that was in the right lane, Huan moved to the right lane to pass the Pontiac. As he passed the Pontiac, Huan looked over and the driver of the Pontiac began making obscene hand gestures at him. Huan sped up to pass, and the Pontiac sped up with him. Huan passed the Pontiac and moved into the left lane. He then had to brake because there was traffic in front of him. Huan looked in his mirror and saw the Pontiac was right behind the Toyota. He became nervous and began changing lanes back and forth in an effort to get away from the Pontiac. Everywhere Huan went, the Pontiac followed, harassing him. Huan moved into the right lane, hoping the Pontiac would pass by and leave him alone. The Pontiac moved into the right lane behind the Toyota and then passed it on the shoulder. Lily screamed, and Huan said, "[O]h, my God, this guy's crazy. He's trying to kill us." The Pontiac moved in front of the Toyota, and the driver slammed on the brakes. Huan braked and tried to move left. He lost control and the Toyota rolled over.

The driver of the Pontiac was identified as Duncan Graham. However, Graham denied that he was involved. According to Graham, this was a matter of mistaken identity. He claimed to have entered Interstate 205 just after the incident occurred but from an on-ramp to the west of the place where it happened. The drivers who saw the incident and obtained the license number of the Pontiac must have confused his green Pontiac with the car that was actually involved. Graham acknowledged, however, that when criminal charges were filed against him, he entered into a plea agreement in which he admitted committing a felony by failing to stop after being involved in an accident resulting in injury or death. (Veh. Code, § 20001, subd. (a).)

Huan and the three Kephart children were not seriously injured when the Toyota rolled over. Lily suffered severe injuries that left her a quadriplegic.

At the time of the incident, Graham was employed by Genuity as an Internet systems engineer (ISE).[3] Genuity was in the business of providing Internet service to commercial enterprises. It used sales executives to generate business. The job of an ISE was to provide technical support to the sales executives via conference calls and visits at customers' businesses. Whenever

---

[3] At that time, the business was known as GTE Internetworking, a division of GTE, which had acquired a company known as Genuity but had ceased using that name. Later, the name Genuity was resurrected. No issue is presented with respect to Genuity's identity as Graham's employer.

a customer visit was necessary, an ISE could get to the customer's business in various ways, including driving there. When an ISE used his or her own car to make a customer call, the ISE would be reimbursed on a mileage basis. Genuity did not require that an ISE bring a personal car to work, and it did not reimburse for mileage to and from work.

In order to maintain expertise on the "latest and greatest" things Genuity was doing, an ISE was required to attend training sessions, generally on a quarterly basis. The sessions usually occurred at corporate headquarters outside of Boston. The sessions ordinarily would begin on a Tuesday so employees could use Monday as a travel day. Genuity did not dictate any particular mode of transportation but would leave that to the discretion of the employees. Genuity would reimburse employees for the expenses of travel to and from training sessions.

At some time 30 to 60 days before October 17, 1999, Graham was informed that he would attend a training session at corporate headquarters during the week following October 17. Graham made reservations to fly from San Francisco to Boston on a flight leaving at 12:50 a.m., on Monday morning, October 18. He chose the "red eye" flight so that he could have Sunday off work.

Graham's wife, Joelle, was teaching a volunteer French class, and she and the couple's two children were preparing teaching aids. Joelle's brother, Eric Lopatin, who lived and worked in Foster City, was involved in course development and graphic design. Lopatin agreed to help with the school project if Joelle and the children came to his place of business on October 17. Graham decided to meet them later in the day for dinner.

In the afternoon of Sunday, October 17, 1999, Graham left home to run some errands. Taking his suitcase, briefcase, and laptop computer, he went to the bank to get money for dinner. He also went to a store to buy water, because he does not like airline water, and to Wal-Mart to pick up some photographs. He then left Tracy on Interstate 205 to meet his family in Foster City. That was when the incident with plaintiffs occurred.

After plaintiffs crashed their Toyota, Graham continued on his way to Foster City.[4] He stayed at Lopatin's workplace for 30 to 45 minutes, after which Graham, Joelle, their children, and Lopatin went to dinner. This took between an hour and an hour and a half. Graham then accepted an invitation

---

[4] When Graham saw Hendricks following him, he called 9-1-1 and reported there was an erratic driver following him. When Hendricks quit following, Graham ended the call. He got off the freeway in Livermore, supposedly because he was trying to avoid Hendricks. Graham eventually got onto Interstate 580 and continued on to Foster City.

to go to Lopatin's house to watch a movie. After a couple of hours there, Graham drove to the airport, where he left his car at a park-and-fly lot. At the airport, Graham received a telephone call from his wife, advising him that CHP officers had visited the house and said he was involved in a traffic incident. At his wife's urging, Graham called the CHP and arranged to meet officers at the park-and-fly lot so they could confirm that there was no damage to his car. As a result, Graham cancelled his 12:50 a.m. flight and left for Boston on a 6:30 a.m. flight.

## DISCUSSION

### I

Plaintiffs claim the trial court erred in denying their motion for judgment notwithstanding the verdict. In their view, "as a matter of law, the undisputed material facts surrounding Graham's conduct on October 17, 1999, compel the conclusion that Graham was acting within the course and scope of his employment with Genuity." As we will explain, the contention fails.

### A

"The trial court's power to grant a motion for JNOV [judgment notwithstanding the verdict] is the same as its power to grant a directed verdict. (Code Civ. Proc., § 629.) The court must accept as true the evidence supporting the jury's verdict, disregarding all conflicting evidence and indulging in every legitimate inference that may be drawn in support of the judgment. The court may grant the motion only if there is no substantial evidence to support the verdict." (*Tognazzini v. San Luis Coastal Unified School Dist.* (2001) 86 Cal.App.4th 1053, 1057–1058 [103 Cal.Rptr.2d 790].) On appeal, we apply the same standard and must uphold the trial court's denial of the motion unless there is no substantial evidence to support the verdict. (*Id.* at p. 1058.)

The issue of scope of employment is generally a question of fact for the jury to determine. (*Perez v. Van Groningen & Sons, Inc.* (1986) 41 Cal.3d 962, 968 [227 Cal.Rptr. 106, 719 P.2d 676].) However, when the facts are undisputed and no conflicting inferences are possible, then the issue may be decided by the court as a question of law. (*Ibid.*)

Plaintiffs assert that the undisputed facts of this case present a question of law—whether Graham was acting within the course and scope of his employment—for us to decide de novo. We disagree.

■ As we explain more fully below, the nature of an employee's conduct and his or her purpose and intent in so acting are important considerations in determining whether he or she acted in the course and scope of employment. (*Lisa M. v. Henry Mayo Newhall Memorial Hospital* (1995) 12 Cal.4th 291, 297 [48 Cal.Rptr.2d 510, 907 P.2d 358] [an employer will not be held liable for an employee's assault or other intentional tort that did not have a causal nexus to the employee's work]; *Farmers Ins. Group v. County of Santa Clara* (1995) 11 Cal.4th 992, 1006 [47 Cal.Rptr.2d 478, 906 P.2d 440] ["vicarious liability is deemed inappropriate where the misconduct does not arise from the conduct of the employer's enterprise but instead arises out of a personal dispute"]; *Tognazzini v. San Luis Coastal Unified School Dist., supra,* 86 Cal.App.4th at p. 1058 [in deciding whether the conduct occurred in the scope of employment, "the trier of fact considers whether the conduct benefited the employer, whether it was authorized or directed by the employer, the reasonable expectations of the employer, the amount of freedom the employee has to perform the duties of the job, the type of work the employee was hired to do, the nature of the conduct involved, and the time and place of the accident, among other things"]; see also *Miller v. Stouffer* (1992) 9 Cal.App.4th 70, 78 [11 Cal.Rptr.2d 454]; *O'Connor v. McDonald's Restaurants* (1990) 220 Cal.App.3d 25, 30 [269 Cal.Rptr. 101].)

Plaintiffs appear to believe that, through adroit pleading, they can limit the considerations that go into this determination. Initially, they made claims based upon intentional misconduct as well as negligence; however, before trial, they dismissed all claims except negligence. Now, in their appellate briefing, plaintiffs repeatedly (1) refer to Graham's conduct as negligence, (2) assert that such things as malice, intent, and motive are irrelevant to the scope of employment, and (3) disregard the witnesses' varying descriptions of the event. Plaintiffs cannot so control the issues. (See *American Employer's Ins. Co. v. Smith* (1980) 105 Cal.App.3d 94, 101–102 [163 Cal.Rptr. 649].)

While the witnesses to the event provided varying perspectives, it would be virtually inconceivable that a reasonable jury would find Graham's conduct to have been mere negligence. Indeed, had this been a criminal prosecution, there was sufficient evidence to support a charge of assault with a deadly weapon. And if someone had died in the incident, evidence of Graham's conduct would have been sufficient to support a charge of murder.

Thus, to determine whether Graham's conduct occurred within the course and scope of his employment, it was necessary to weigh the varying testimony of the witnesses in order to assess the nature of Graham's conduct

and to draw inferences concerning his purpose, intent, and reasons for his actions. For this reason, we reject plaintiffs' assertion that we should disregard the jury verdict and resolve the case de novo.

Instead, we will apply the substantial evidence rule, viewing the record in a light most favorable to the verdict, resolving all conflicts in the evidence and drawing all reasonable inferences in favor of the verdict. We can interfere with the jury's determination only if, when the record is so viewed, we can say that there is no substantial evidence to support the verdict. (*Board of Education v. Jack M.* (1977) 19 Cal.3d 691, 697 [139 Cal.Rptr. 700, 566 P.2d 602]; *County of Mariposa v. Yosemite West Associates* (1988) 202 Cal.App.3d 791, 807 [248 Cal.Rptr. 778].)

### B

■ Under the respondeat superior doctrine, an employer may be vicariously liable for torts committed by an employee. (*Perez v. Van Groningen & Sons, Inc., supra*, 41 Cal.3d at p. 967.) The rule is based on the policy that losses caused by the torts of employees, which as a practical matter are certain to occur in the conduct of the employer's enterprise, should be placed on the enterprise as a cost of doing business. (*Ibid.*) The basic test for vicarious liability is whether the employee's tort was committed within the scope of employment. (*Ibid.*)

The determination of scope of employment can be a difficult task. (*O'Connor v. McDonald's Restaurants, supra*, 220 Cal.App.3d at pp. 29–30.) Hence, there are numerous judicially developed rules, applicable in differing circumstances, for determining whether an employee was acting within the scope of employment.

■ Under the going-and-coming rule, an employee is considered not to be in the scope of employment while going to or coming from work. (*Tognazzini v. San Luis Coastal Unified School Dist., supra*, 86 Cal.App.4th at p. 1057.)

An exception, upon which plaintiffs rely, is the special errand rule. An employee who is going to work, or coming from work, is within the scope of employment if the employee is on a special errand, either as part of his or her regular duties or at a specific order or request of the employer. (*Tognazzini v. San Luis Coastal Unified School Dist., supra*, 86 Cal.App.4th at p. 1057.) When engaging in a special errand, the employee is considered to be in the

course and scope of employment from the time that he or she starts on the errand until returning, unless he or she deviates from the errand in such a material manner as to constitute a departure from the course of employment. (*O'Connor v. McDonald's Restaurants, supra,* 220 Cal.App.3d at p. 30; *Felix v. Asai* (1987) 192 Cal.App.3d 926, 931 [237 Cal.Rptr. 718].)

In determining whether an employee has departed from the course and scope of employment, a variety of factors must be considered and weighed, including the intent of the employee; the nature, time and place of the employee's conduct; the work the employee was hired to do; the incidental acts the employer should reasonably expect the employee to do; the amount of freedom allowed to the employee in performing his or her duties; and the amount of time consumed in the personal activity. (*O'Connor v. McDonald's Restaurants, supra,* 220 Cal.App.3d at p. 30; *Felix v. Asai, supra,* 192 Cal.App.3d at pp. 932–933.)

In the circumstances of this case, there is another standard that overlays the determination whether the conduct is within the course and scope of employment. An employer may be, but will not necessarily be, held vicariously liable for an employee's torts that are willful, malicious, or criminal. (*Lisa M. v. Henry Mayo Newhall Memorial Hospital, supra,* 12 Cal.4th at p. 297 (hereafter *Lisa M.*).) However, vicarious liability is inappropriate when an employee's misconduct does not arise from the conduct of the employer's enterprise, but instead arises from a personal dispute. (*Farmers Ins. Group v. County of Santa Clara, supra,* 11 Cal.4th at p. 1006 (hereafter *Farmers Ins. Group*).)

In *Lisa M.,* a case in which an ultrasound technician performed an ultrasound examination and then, under false pretenses, molested the patient, the California Supreme Court sought to clarify the standard of vicarious liability for intentional torts. For the respondeat superior doctrine to apply, it is not necessary that the employee's conduct be motivated by a desire to serve the employer's interests. (*Lisa M., supra,* 12 Cal.4th at p. 297.)[5] But there must be a "causal nexus to the employee's work." (*Ibid.*) An employer is not liable when an employee inflicts an injury out of personal malice not engendered by the employment. (*Id.* at p. 298.) The requirement that a tort be engendered by, or arise from, the work is not satisfied by a mere "but for" test. (*Ibid.*) "That the employment brought tortfeasor and victim together in time

---

[5] The Court added, however: "Because an intentional tort gives rise to respondeat superior liability only if it was engendered by the employment, our disavowal of motive as a singular test of respondeat superior liability does not mean the employee's motive is irrelevant. An act serving only the employee's personal interest is less likely to arise from or be engendered by the employment than an act that, even if misguided, was intended to serve the employer in some way." (*Lisa M., supra,* 12 Cal.4th at p. 298.)

and place is not enough." (*Ibid.*) The necessary link between the employment and the injury may be described in various ways: "the incident leading to injury must be an 'outgrowth' of the employment [citation]; the risk of tortious injury must be ' "inherent in the working environment" ' [citation] or ' "typical of or broadly incidental to the enterprise [the employer] has undertaken" ' [citation]." (*Ibid.*) Courts may consider whether the tort was foreseeable in the sense that the employment is "such as predictably to create the risk employees will commit intentional torts of the type for which liability is sought." (*Id.* at p. 299.) The conduct should not be so " 'unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the employer's business.' [Citations.]" (*Ibid.*)

Applying these principles to the facts in *Lisa M.*, the Supreme Court held the defendant hospital was not vicariously liable for the sexual molestation committed by its employee. Evidence established "but for" causation in that the technician's employment made it possible for him to meet the patient and to be alone with her in circumstances which made the assault possible. (*Lisa M., supra*, 12 Cal.4th at pp. 299–300.) However, the technician's actions were personally motivated by " 'propinquity and lust' " and "were not generated by or an outgrowth of workplace responsibilities, conditions or events." (*Id.* at p. 302.) And the conduct was not foreseeable in the sense needed for respondeat superior liability. Rather, the assault "was the independent product of [the employee's] aberrant decision to engage in conduct unrelated to his duties. In the pertinent sense, therefore, [the employee's] actions were not foreseeable from the nature of the work he was employed to perform." (*Id.* at p. 303.)

For similar reasons, the Supreme Court held an employer was not vicariously liable for acts of sexual harassment committed by a deputy sheriff against other deputy sheriffs at the county jail where they were all assigned. (*Farmers Ins. Group, supra*, 11 Cal.4th 992, 997.) The court explained that " '[i]f the employee's tort is personal in nature, mere presence at the place of employment and attendance to occupational duties prior or subsequent to the offense will not give rise to [vicarious liability of the employer].' [Citation.]" (*Id.* at pp. 1005, 1007.) The court concluded the acts of sexual harassment by the deputy sheriff were personal rather than related to his duties; were not reasonably necessary to the deputy's comfort, convenience, health, and welfare while at work; and did not arise from a work-related dispute. (*Id.* at p. 1007.) And, the court noted, "foreseeability in the respondeat superior context is distinct from the negligence test for foreseeability [citations] . . . ." (*Id.* at p. 1010.) The risk "must be evaluated in the context of the employer's particular enterprise," and "it is not enough that a risk be neither unusual nor

startling as a general matter . . . ." (*Id.* at p. 1009.) "While it is no doubt true that sexual harassment is a pervasive problem and that many workers in many different fields of employment have experienced some form of uninvited and unwanted sexual attention," it is not "typical of or broadly incidental to" the operation of a county jail. (*Id.* at pp. 1009, 1011.) Hence, the deputy sheriff's "lewd propositioning and offensive touching of his trainee and coworkers were not within the scope of his employment at the county jail." (*Id.* at p. 1017.)

We now turn to an application of these legal principles to the facts of this case.

## C

Prior to the incident with plaintiffs, Graham left his home to do errands, to meet his family for dinner, and then to go to the airport for his business trip. He did not intend to return home before going to the airport, and when he got onto Interstate 205, Graham was on the same route that he would have taken had he been going straight to the airport. In this sense, the place in which the incident occurred was consistent with his being on a special errand business trip.

On the other hand, the jury reasonably could find that Graham left his home at least five hours earlier than was required by his business trip and that, as he testified, he did so entirely for personal reasons. Indeed, evidence showed that Genuity scheduled training sessions to begin on Tuesday so as not to interfere with employees' personal time on weekends. And Graham scheduled his flight for early Monday morning so as not to impose on his personal weekend time. Consequently, the time of the incident was well removed from any requirement of Graham's employment.

Considering together both the time and place of the incident, the jury reasonably could conclude that the connection between the incident and Graham's employment was tenuous.

In addition, the jury reasonably could conclude that Graham deliberately caused the crash of the Toyota by intentionally forcing it off of the roadway and, therefore, that his conduct was willful, malicious, and even criminal. This triggers the need to analyze Genuity's potential vicarious liability under standards identified in decisions such as *Lisa M., supra,* 12 Cal.4th 291, and *Farmers Ins. Group, supra,* 11 Cal.4th 992.

Nothing in the evidence suggests that Graham's attack on plaintiffs was somehow motivated by an intent to serve Genuity's interests. Rather, the evidence supports the jury's implied finding that Graham was motivated entirely by personal malice or compulsion. It cannot be said that, as a matter

of law, this type of conduct was inherent in Graham's employment or typical of or broadly incidental to Genuity's enterprise. And it cannot be said his employment was such "as predictably to create the risk" that he would commit this type of intentional misconduct. (*Lisa M., supra,* 12 Cal.4th at p. 299.) Certainly, Graham's conduct was " 'unusual or startling' " in every sense, such that it would not be fair to include the harm caused by it in the employer's cost of doing business. (*Ibid.*)

The only factor tending to support vicarious liability is that Graham intended eventually to go to the airport for a business trip. Weighing against this, however, are the facts that the incident occurred many hours before he needed to go to the airport; that he intended to engage in personal and nonbusiness activities in the intervening hours; that he was motivated by personal malice rather than some intent to serve Genuity's interests; and that his conduct was intentional and egregious.

Companies whose employees sometimes drive on business should not be vicariously liable for every intentional, tortious act of an employee with the employee's vehicle simply because there is some tenuous connection to the business. (See *Yamaguchi v. Harnsmut* (2003) 106 Cal.App.4th 472, 484 [130 Cal.Rptr.2d 706] [scope of employment is a question of fact where cook threw hot oil at police officers]; see also *Lisa M., supra,* 12 Cal.4th at p. 294 [employer not liable although employee used an instrument of his employment in committing assault].)

Whether Graham was within the course and scope of his employment was a question for the jury to resolve, and the evidence supports the jury's determination that he was not.

In challenging the jury's determination, plaintiffs assert that the only reason Graham was on Interstate 205 at the time of the incident was because of his business trip. Assuming for purposes of discussion that this was so, it relates to "but for" causation, which is not sufficient to establish vicarious liability for an intentional tort. (*Lisa M., supra,* 12 Cal.4th at p. 298.) That the employment may have brought the tortfeasor and victim together does not establish the nexus required for respondeat superior liability. (*Ibid.*)

Plaintiffs point out that traffic accidents are necessarily foreseeable. (See *Cronin v. J.B.E. Olson Corp.* (1972) 8 Cal.3d 121, 126 [104 Cal.Rptr. 433, 501 P.2d 1153]; *Huntsinger v. Glass Containers Corp.* (1972) 22 Cal.App.3d 803, 810 [99 Cal.Rptr. 666].) However, foreseeability in the respondeat superior context is distinct from the negligence test for foreseeability. (*Farmers Ins. Group, supra,* 11 Cal.4th at p. 1010.) As we have noted, to impose respondeat superior liability for an employee's intentional torts, the

employment must be such "as predictably to create the risk" that employees will commit the type of intentional tort at issue. (*Lisa M., supra,* 12 Cal.4th at p. 299.) It cannot be said that, as a matter of law, Graham's employment predictably created a risk of the type of egregious and intentional conduct in which he engaged.

Plaintiffs claim this case is governed by the decision in *Fields v. Sanders* (1947) 29 Cal.2d 834 [180 P.2d 684] (hereafter *Fields*). There, a truck driver was driving his employer's truck on the way to make deliveries when the plaintiff claimed the truck struck his car. The plaintiff motioned the truck driver to stop and sought to obtain his number, company name, and license. (*Id.* at p. 836.) When the truck driver denied hitting the car, an argument ensued during which the truck driver hit the plaintiff with an object described as a wrench. (*Id.* at pp. 836–837.) The Supreme Court found vicarious liability was appropriate because the truck driver's entire course of conduct, including his attempt to shield his employer from liability by denying that he struck the plaintiff's car, was inextricably intertwined with his service to his employer. (*Id.* at pp. 840–841.) Moreover, the truck driver testified that during the entire incident he was calm, did not get excited, and did not act out of anger. (*Id.* at p. 842.)

In contrast, Graham was in his personal car at the time of the incident. While use of his personal car was permitted, it was not required by Genuity. Graham was on a route that eventually would take him to the airport. However, he was involved in no other work-related activity. He left home many hours earlier than his work-related flight would have required. He did so for personal reasons, and he intended to engage in personal activities in the interim. There is no evidence of a work-related dispute, and no evidence that Graham somehow thought he was serving Genuity's interests in engaging in his intentional misconduct. In fact, the jury reasonably could conclude that Graham's conduct was engendered by personal malice or compulsion rather than service to his employer. Thus, *Fields* is not controlling here.

■ In plaintiffs' view, policy factors underlying the respondeat superior doctrine support the imposition of vicarious liability in this case. Those policy factors are "(1) to prevent recurrence of the tortious conduct; (2) to give greater assurance of compensation for the victim; and (3) to ensure that the victim's losses will be equitably borne by those who benefit from the enterprise that gave rise to the injury." (*Farmers Ins. Group, supra,* 11 Cal.4th at p. 1013.) These factors do not constitute the legal standard for respondeat superior liability, but they provide guidance to the courts in considering whether the doctrine should be applied. (*Lisa M., supra,* 12 Cal.4th at p. 304.)

Plaintiffs' public policy argument fails because conduct of the type committed by Graham subjects a person to the danger of severe personal injury, as well as the potential of significant criminal penalties, ruinous civil liability, restrictions or suspension of the driving privilege, and substantially increased insurance premiums. These dangers provide powerful deterrents to this type of conduct; indeed, the overwhelming majority of motorists do not engage in this type of unusual and startling behavior. If these dangers are insufficient to deter someone from engaging in such aberrant behavior, it is difficult to perceive what more an employer could do. (See *Hoblitzell v. City of Ione* (2003) 110 Cal.App.4th 675, 686 [2 Cal.Rptr.3d 8].)

From the perspective of a plaintiff, imposition of vicarious liability would always serve the policy of giving greater assurance of compensation to the victim. But respondeat superior liability is not "merely a legal artifice invoked to reach a deep pocket or that it is based on an elaborate theory of optimal resource allocation." (*Alma W. v. Oakland Unified School Dist.* (1981) 123 Cal.App.3d 133, 143–144 [176 Cal.Rptr. 287].) The second and third policy factors are inextricably bound together (*Le Elder v. Rice* (1994) 21 Cal.App.4th 1604, 1610 [26 Cal.Rptr.2d 749]; *Alma W. v. Oakland Unified School Dist., supra,* 123 Cal.App.3d at pp. 143–144) and vicarious liability is invoked to provide greater assurance of compensation to victims in circumstances where it is equitable to shift losses to the employer because the employer benefits from the injury-producing activity and such losses are, as a practical matter, sure to occur from the conduct of the enterprise. (*Le Elder v. Rice, supra,* 21 Cal.App.4th at p. 1610; *Alma W. v. Oakland Unified School Dist., supra,* 123 Cal.App.3d at p. 144.)

In this instance, Genuity could not have derived any benefit from Graham's conduct, and it cannot be said that such conduct was, as a practical matter, sure to occur in the conduct of Genuity's business.

■ In summary, an employer may be vicariously liable for injuries due to an employee's intentional tortious conduct that results or arises from pursuit of the employer's interests. (*Farmers Ins. Group, supra,* 11 Cal.4th at p. 1005.) And an employer may be vicariously liable for intentional tortious conduct that results or arises from a dispute over the performance of an employee's duties, even though the conduct was not intended to benefit the employer or further the employer's interests. (*Id.* at p. 1006.) However, regardless of where and when the injury occurs, an employer will not be held liable where intentional misconduct does not arise from the conduct of the employer's enterprise but instead arises from personal malice or as the result of personal compulsion. (*Ibid.*) ■ The evidence reasonably supports the jury's determination that the conduct in this case was of the latter type.

Accordingly, the trial court properly denied plaintiffs' motion for judgment notwithstanding the verdict.

## II–IV[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is affirmed.

Butz, J., and Cantil-Sakauye, J., concurred.

A petition for a rehearing was denied March 2, 2006, and appellants' petition for review by the Supreme Court was denied May 10, 2006, S141832. George, C. J., did not participate therein.

---

[*]See footnote, *ante*, page 280.