Filed 9/13/22 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO


| | |
|---|---|
| RONALD MUSGROVE et al., | B311504 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC673010) |
| v. | |
| JOEL SILVER, | ORDER MODIFYING OPINION AND DENYING REHEARING |
| Defendant and Respondent. | NO CHANGE IN THE JUDGMENT |


THE COURT:

It is ordered that the opinion filed herein on August 25, 2022, be modified as follows:

1. At the end of the first (partial) sentence on page 8, which ends with "from our consideration," insert footnote 3 as follows:

**3**     In a petition for rehearing, plaintiffs contend that we impermissibly failed to address their evidentiary objections.  We did no such thing.  We assumed them to have merit, and proceeded to analyze the summary judgment on that assumption.  As a result, analyzing the merits of the objections serves no purpose.  Plaintiffs assert that we "necessarily relied" on the evidence we assumed to be invalidly admitted, contrary to our assumption.  They are wrong.

2.   After the next sentence on page 8, which is the first whole sentence on that page, insert footnote 4 as follows (and renumber subsequent footnotes accordingly):

**4**     In a petition for rehearing, plaintiffs also contend that we synthesized the relevant law differently than they and the trial court did.  Because, as noted in the text, our review of a summary judgment motion is de novo, our task is to analyze the trial court's ruling—not its reasoning.  We are not bound by the parties' synthesis of the law and are free to conduct our legal research and synthesize the law without running it by the parties first.

3.   In the first sentence beneath the heading "c. Benefit- and custom-focused test," which begins on page 15 and continues onto page 16, omit the phrase "allegedly tortious" (on page 16) so that the sentence reads:

This test focuses on whether the employee's conduct "*either*" (1) "provided [some conceivable] benefit to the

employer" *or* (2) has otherwise become a "'customary incident of the employment relationship.'"

4.  On page 16, in the sentence immediately preceding the heading "d.     Public policy-focused test," omit the phrase "allegedly tortious," so that the sentence reads:

    Although a benefit need only be "conceivable," the benefit must nevertheless be "'sufficient enough to justify making the employer responsible'" for the employee's conduct.

5.  In the first sentence beneath the heading "3.     *Benefit- and custom-focused test*," which begins on page 23 and continues onto page 24, omit the word "tortious" (on page 23), so that the sentence reads:

    Silver is also not vicariously liable, as a matter of law, under the test that examines whether the employee's conduct (1) conceivably benefited the employer or (2) was a customary incident of the employment relationship.

6.  In the second-to-last sentence on page 24, omit the word "*tortious*," so that the sentence reads:

    Plaintiffs' argument ignores that what matters for this analysis is whether the *employee's conduct* benefits the employer or is a customary part of the employment relationship.

7. In the last sentence on page 24, omit the word "tortious," so that the sentence reads:

> According to the allegations of plaintiffs' operative complaint, Herold's conduct was plying Musgrove with alcohol and cocaine and allowing her to swim.

\*　　\*　　\*

There is no change in the judgment.

Appellant's petition for rehearing is denied.

_____

LUI, P. J.　　　　ASHMANN-GERST, J.　　　　HOFFSTADT, J.

Filed 8/25/22 (unmodified version)
**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO


| | |
|---|---|
| RONALD MUSGROVE et al., | B311504 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC673010) |
| v. | |
| JOEL SILVER, | |
| Defendant and Respondent. | |


APPEAL from a judgment of the Superior Court of Los Angeles County, Dennis J. Landin, Judge. Affirmed.

The Wallace Firm and Bradley S. Wallace; Joseph S. Socher for Plaintiffs and Appellants.

Murchison & Cumming, Corine Zygelman, and Matthew E. Voss for Defendant and Respondent.

\*      \*      \*

As part of an entourage of family and friends, a Hollywood producer brought the executive assistant he employed through his company as well as a French chef he personally employed to a luxurious resort in Bora Bora; the trip was part vacation for both the assistant and the chef, although the assistant met with the concierge to plan the entourage's daily recreational activities and the chef prepared all lunches and dinners.  Tragically, the executive assistant drowned when she went for a midnight swim in the lagoon outside her overwater bungalow.  The drowning was accidental, and related to her ingestion of alcohol and cocaine in the hours prior to her swim.  The executive assistant's parents sued the producer for wrongful death, on the theory that he is (1) directly liable, because he paid all resort-related expenses of the trip, including for alcohol, and (2) vicariously liable, because he employed the chef, who had met up with the executive assistant for a late-night rendezvous when she drank half a bottle of wine and snorted a "significant" amount of cocaine just before going for a swim.  In granting summary judgment, the trial court ruled that the producer was not liable under either theory as a matter of law.  The primary issue on appeal is whether the chef was acting within the scope of his employment—thereby rendering the producer vicariously liable—when the chef met up with the executive assistant for a nightcap and, by allegedly supplying her with alcohol and cocaine while knowing she liked to swim at night, put her in a position of peril from which he failed to protect her.  Although the precedent on vicarious liability is untidy, we hold that the chef's late-night activities with the assistant were not within the scope of his employment under each of the four

2

tests articulated by the California courts for assessing the scope of employment for purposes of imposing vicarious liability. Because the trial court's ruling on direct liability was also correct, we affirm the judgment for the producer.

## FACTS AND PROCEDURAL BACKGROUND

### I.     Facts

#### A.     *A tragic death*

In August 2015, 28-year-old Carmel Musgrove (Musgrove) traveled to the Four Seasons Resort on a private island in Bora Bora, French Polynesia.  She was one of 14 or 15 people—largely family and friends—whom Hollywood producer Joel Silver (Silver) had invited to accompany him in attending actress Jennifer Aniston's wedding celebration.  Musgrove stayed in her own overwater bungalow at the resort.  Along with Silver's other guests, she went fishing, played volleyball, and went to the spa. She also attended the group lunches and dinners Silver hosted, where she would regularly drink wine.  Silver covered all of the group's expenses on the trip, including alcohol.

On the evening of August 18, 2015, the group ate dinner indoors because the wind was howling and the water, choppy. Musgrove had wine with dinner, but did not become visibly intoxicated.  Around 9 p.m., she went to the Silver's family bungalow to watch a movie with his then young children.  After agreeing via text message to meet up with 47-year-old Martin Herold (Herold), another member of Silver's encourage, Musgrove told Silver's family she was not feeling well and excused herself to go back to her bungalow a little after 10 p.m.

Musgrove then met up with Herold to "party."  Although precisely where they met and precisely what they did is subject to some dispute, it is undisputed that over the next hour or so

3

Musgrove and Herold kissed, Musgrove drank more wine, and Musgrove ingested cocaine.

At some point around midnight, and after departing from her rendezvous with Herold, Musgrove disrobed in her bungalow and climbed down the ladder from her bungalow's platform into the dark waters of the lagoon for a nighttime dip.

Musgrove did not show up at breakfast or lunch the next day.

Her body washed up onto shore the following night. Two autopsies confirmed that her cause of death was accidental drowning, with contributing causes of alcohol and drug use. Her blood alcohol content was 0.20, which is more than twice the legal limit for drinking. She also had a "significant" amount of cocaine in her liver.

### B. *Employment relationships*

#### 1. *Musgrove*

For many years prior to the August 2015 trip, Musgrove had been working as Silver's executive assistant. She was officially employed by Silver Pictures Entertainment.

Going to Bora Bora was not a requirement of her job. Rather, Silver invited Musgrove to come along if she wanted: If she came, she would continue to receive her salary and would be expected to spend "maybe 10 percent" of her time coordinating with the resort's staff and others in lining up the recreational activities and meals for Silver and his guests; the rest of the time, however, she would be "on vacation" like the others and would have her travel, lodging, and other expenses paid.

Silver did not prohibit his guests from partaking of alcohol at dinner, at the resort's bars, or through room service;

conversely, he did not require or pressure anyone to drink. Whether and how much to drink alcohol was up to each guest.

2.      *Herold*

For over a decade prior to August 2015, Silver had personally employed Herold as his "family's personal chef" who would travel with Silver and his family, and prepare their meals. Silver paid Herold a salary and covered all of his travel, lodging, and other expenses, including any alcohol Herold chose to drink.

Herold arrived in Bora Bora a few days before the rest of Silver's entourage in order to purchase groceries for the lunches and dinners he was to prepare during the trip. Herold had no fixed working hours; instead, he was expected to prepare the group's lunches and dinners, but was otherwise free to spend his remaining time however he wished.

C.      ***Personal relationship between Musgrove and Herold***

By August 2015, Musgrove and Herold were not strangers. They had met a few years prior, when Musgrove was traveling as Silver's executive assistant and Herold was accompanying Silver's family as their chef.

Before she departed for the August 2015 Bora Bora trip, Musgrove emailed Herold and asked if he got "any 'candy' down there." Herold responded that he "got a bag of bora herb," which he later explained meant marijuana. Musgrove was unimpressed, responding, "Meh. U don't [have] a hook up there for the other stuff?" When Herold assured her "Got everything," she responded "What I like to hear" with a smiley face symbol.

Herold also knew that Musgrove enjoyed swimming in the lagoon near the overwater bungalows.

## II.    Procedural Background

### A.    *Pleadings*

In August 2017, Musgrove's parents—Ronald and Ann Musgrove (collectively, plaintiffs)—sued Herold and Silver for the wrongful death of their daughter.[1]  In the operative second amended complaint,[2] plaintiffs alleged that Herold and Silver were liable because they had "exposed" Musgrove to "an unreasonable risk of harm" by "furnishing" her with "an excessive amount of alcohol" and "drugs," and simultaneously "promoting dangerous activities, including alcohol consumption, drug consumption, and swimming in a lagoon late at night during unfavorable conditions."  Plaintiffs more specifically alleged two theories of liability against Silver—namely, that Silver was (1) directly liable for Musgrove's death because he "caused [her] to be in a vulnerable state on the night" of her death, and (2) "vicariously liable for the negligence" of Herold because Herold was "acting within the course and scope of [his] . . . employment at the time of [Herold's] negligence."

### B.    *Summary judgment*

Silver moved for summary judgment.  Following a full round of briefing, evidentiary objections, and a hearing, the trial court granted Silver's motion.  The court ruled that Silver was not directly liable for Musgrove's death because Silver had no "special relationship" with Musgrove that would legally obligate

---

1    They also sued Silver Pictures Entertainment and Silver-Katz Holdings, LLC, but those defendants were dismissed following a good faith settlement.

2    The trial court granted plaintiffs leave to amend and file a second amended complaint after we issued an alternative writ effectively instructing it to do so.

him to "assume[] control of her safety and welfare"; to hold Silver directly liable simply because Musgrove "accompanied him" to Bora Bora, the court reasoned, would "contradict[]" California tort law. The court further ruled that Silver was not vicariously liable for Musgrove's death. Although the court found triable issues of fact as to whether Herold owed Musgrove a duty of care and breached that duty, the court concluded as a matter of law that Silver was not vicariously liable for Herold's arguably negligent conduct "in placing Musgrove in a position of peril" by plying her with alcohol and drugs and then not protecting her from swimming. More specifically, the court reasoned that Herold's conduct was outside the scope of his employment by Silver because (1) it was "not an 'outgrowth' of his employment [as a chef or] 'inherent in the working environment,'" (2) it was not "'typical of or broadly incidental to' [Silver's employment of him as a chef] or, in a general way, foreseeable from [Herold's] duties"; and (3) it was "neither a benefit to the company nor a customary incident" of Herold's "employment relationship" with Silver because Herold's work as a chef "did not cause him to invite Musgrove to his bungalow or to put her in a vulnerable situation and to not protect her from danger."

C.  *Appeal*

Following entry of judgment, plaintiffs filed this timely appeal.

## DISCUSSION

Plaintiffs argue that the trial court erred in (1) granting summary judgment, and while doing so, (2) not excluding portions of Silver's declaration as impermissible and conclusory lay opinion. We need not consider plaintiffs' evidentiary objections because, as we discuss below, summary judgment is

7

warranted even if we assume evidentiary error and exclude that evidence from our consideration.  We independently review a trial court's grant of summary judgment.  (*Hartford Casualty Ins. Co. v. Swift Distribution, Inc.* (2014) 59 Cal.4th 277, 286 (*Hartford*).)

## I.  Pertinent Law

### A.  *The law of summary judgment*

"Summary judgment is appropriate only 'where no triable issue of material fact exists and the moving party is entitled to judgment as a matter of law.'"  (*Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 618 (*Regents*); *Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476; Code Civ. Proc., § 437c, subd. (c).)  To prevail on such a motion, the moving party—here, Silver—must show that the plaintiffs "ha[ve] not established, and reasonably cannot be expected to establish, one or more elements of the cause of action in question."  (*Patterson v. Domino's Pizza, LLC* (2014) 60 Cal.4th 474, 500.)  In independently examining whether Silver has made this showing, we evaluate the issues framed by the plaintiffs' operative pleading (*Lona v. Citibank, N.A.* (2011) 202 Cal.App.4th 89, 115), consider all of the evidence before the trial court except evidence to which an objection was made and sustained (as well as evidence we will assume should have been excluded) (*Hartford*, *supra*, 59 Cal.4th at p. 286), liberally construe that evidence in support of the party opposing summary judgment, and resolve all doubts concerning that evidence in favor of that party (*id.* at p. 286; Code Civ. Proc., § 437c, subd. (c)).  We independently review all subsidiary legal questions—such as whether a duty of care or a special relationship exists—as we do *all* questions of law. (*Brown v. USA Taekwondo* (2021) 11 Cal.5th 204, 213 (*Brown*) [duty of care]; *Regents*, at p. 620  [special relationship].)  And

8

although "'the determination whether an employee has acted within the scope of employment'" "'[o]rdinarily'" "'presents a question of fact[,] it becomes a question of law'"—and hence an appropriate basis for a grant of summary judgment—"'when "the facts are undisputed and no conflicting inferences are possible."'" (*Lisa M. v. Henry Mayo Newhall Memorial Hospital* (1995) 12 Cal.4th 291, 299 (*Lisa M.*), quoting *Mary M. v. City of Los Angeles* (1991) 54 Cal.3d 202, 213 (*Mary M.*).)

### B. *Pertinent tort principles*

To prevail against Silver on their sole claim of wrongful death, plaintiffs must prove "(1) a 'wrongful act or neglect' on the part of one or more persons [(that is, negligence)] that (2) 'cause[s]' (3) the 'death of [another] person.'" (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 390.) A person may be liable either for (1) *his own* negligence, in which case he is *directly* liable for the resulting death, or (2) *someone else's* negligence, in which case he is *vicariously* liable because—in the eyes of the law—the other person's negligence is deemed to be his own. (E.g., *Hooker v. Department of Transportation* (2002) 27 Cal.4th 198, 210; *de Villers v. County of San Diego* (2007) 156 Cal.App.4th 238, 247.) A person acts negligently only if he "'had a duty to use due care'" and "'breached that duty.'" (*Brown, supra*, 11 Cal.5th at p. 213.)

#### 1. *Duty*

The default rule of tort law in California is that "each person has a duty to act with reasonable care under the circumstances." (*Regents, supra*, 4 Cal.5th at p. 619; Civ. Code, § 1714, subd. (a).) At the same time, a person generally "has no duty to come to the aid of another" by "assist[ing] or protect[ing]" them "unless there is some relationship between them which

9

gives rise to a duty to act." (*Williams v. State of California* (1983) 34 Cal.3d 18, 23 (*Williams*); *Regents*, at p. 619.)

This "no duty to assist or protect" rule has two exceptions pertinent to this case.

First, the "'general duty to exercise due care includes the duty not to place another person in a situation in which the other person is exposed to an unreasonable risk of harm'"; in other words, it includes the duty not to ""'mak[e] the [other person's] position worse'""" by placing them in peril. (*Zelig v. County of Los Angeles* (2002) 27 Cal.4th 1112, 1128 (*Zelig*), quoting *Lugtu v. California Highway Patrol* (2001) 26 Cal.4th 703, 716; *Brown*, *supra*, 11 Cal.5th at p. 214.) If a person's conduct puts another person in peril, that conduct not only constitutes a breach of the duty of care but *also* obligates him to take "affirmative action to assist or protect" the other person from that peril. (*Regents*, *supra*, 4 Cal.5th at p. 619; *Williams*, *supra*, 34 Cal.3d at p. 23; *Zelig*, at p. 1129; *Weirum v. RKO General, Inc.* (1975) 15 Cal.3d 40, 48-49 (*Weirum*); *McHenry v. Asylum Entertainment Delaware, LLC* (2020) 46 Cal.App.5th 469, 485 ["a duty to act can arise from one party's conduct in creating the very peril that necessitates aid and intervention"]; *Jane Doe No. 1 v. Uber Technologies, Inc.* (2022) 79 Cal.App.5th 410, 424 ["when a defendant *has* affirmatively 'created a peril' that foreseeably leads to the plaintiff's harm . . ., the defendant can . . . be held liable for failing to also protect the plaintiff from that peril"].)

Second, a person (typically, the person who becomes the defendant) can have a "duty to protect or assist" another (typically, the person who becomes the plaintiff) if he has a "special relationship" with either (1) the third person who injures the plaintiff or (2) the plaintiff herself. (*Regents*, *supra*, 4 Cal.5th

10

at p. 619; *Zelig, supra,* 27 Cal.4th at p. 1129; *Davidson v. City of Westminster* (1982) 32 Cal.3d 197, 203 (*Davidson*); *Brown, supra,* 11 Cal.5th at p. 216.)  The first type of special relationship runs between the defendant and the third person who injured the plaintiff, and obligates the defendant *to control* the third person. (*Regents,* at p. 621; *Zelig,* at p. 1129; *Davidson,* at p. 203.)  The second type of special relationship runs between the defendant and the plaintiff, and obligates the defendant *to protect* the plaintiff.  (*Zelig,* at p. 1129; *Davidson,* at p. 203.)

Special relationships have "defined boundaries," insofar as they are "limited" both "to specific individuals" and to the "'risks that arise within the scope of the [special] relationship [at issue].'"  (*Regents, supra,* 4 Cal.5th at p. 621; Rest.3d Torts, § 40, subd. (a); *Doe v. Roman Catholic Archbishop of Los Angeles* (2021) 70 Cal.App.5th 657, 670 (*Doe*).)  Whether a special relationship between two people exists turns on "the particular facts and circumstances of their association with one another." (*Brown, supra,* 11 Cal.5th at p. 221.)  Because the existence of a duty to act is ultimately a public policy question (*Weirum, supra,* 15 Cal.3d at p. 46), and because special relationships are one means by which a duty may be found to exist, it is not surprising that whether a special relationship exists in a particular case is, at bottom, also a question of law based upon public policy considerations.  (Rest.3d Torts, § 40, com. h. ["Whether a relationship is deemed special is a conclusion based on reasons of principle or policy."].)  What is more, the existence of a special relationship does not *automatically* create a duty to act; instead, as our Supreme Court recently reaffirmed, courts must also assess whether public policy concerns warrant "limiting" the duty

11

that might otherwise arise by virtue of a special relationship. (*Brown*, at pp. 209, 218-219; *Doe*, at p. 670.)

> 2. *Vicarious liability based on the special relationship between employer and employee*

Employers have a special relationship with their employees. (Rest.3d Torts, § 40, subd. (b).) This relationship rests (1) partly on employers' ability to control their employees' conduct and (2) partly on the public policy notion that employers who benefit from their employees' conduct should concomitantly bear "the risks incident to [their] enterprise" as a "cost of doing business." (*Hinman v. Westinghouse Elec. Co.* (1970) 2 Cal.3d 956, 960 (*Hinman*); *Perez v. Van Groningen & Sons, Inc.* (1986) 41 Cal.3d 962, 968 (*Perez*); *Mary M.*, *supra*, 54 Cal.3d at pp. 208-209; *Rodgers v. Kemper Constr. Co.* (1975) 50 Cal.App.3d 608, 618-619 (*Rodgers*).) Imposing liability for the employee's conduct upon the employer has nothing to do with the employer's *fault*. (*Hinman*, at p. 960.)

Due to this special relationship, California deems employers to be vicariously liable for the torts committed by their employees if, but only if, *the employee is acting within the scope of employment.* (*Mary M.*, *supra*, 54 Cal.3d at p. 208; *Lisa M.*, *supra*, 12 Cal.4th at p. 296; *Farmers Ins. Group v. County of Santa Clara* (1995) 11 Cal.4th 992, 1005 (*Farmers*).) This legal principle is known more commonly as respondeat superior. (*Mary M.*, at p. 208; *Moreno v. Visser Ranch, Inc.* (2018) 30 Cal.App.5th 568, 575 (*Moreno*).)

One court has described the task of assessing whether an employee is acting within the scope of employment as "difficult." (*Kephart v. Genuity, Inc.* (2006) 136 Cal.App.4th 280, 291 (*Kephart*).) This is an understatement. The difficulty stems in

part from the fact that the decision whether an employee is acting within the scope of employment is imbued with policy considerations (*Hinman*, *supra*, 2 Cal.3d at p. 959; *Perez*, *supra*, 41 Cal.3d at p. 967), and in part from the fact that the courts—while agreeing that the scope of employment should be "interpreted broadly" (*Farmers*, *supra*, 11 Cal.4th at p. 1004)—have nevertheless articulated no fewer than four different tests for assessing whether particular acts should be deemed to be within the scope of employment and hence a basis for imposing vicarious liability (*Moreno*, *supra*, 30 Cal.App.5th at p. 577).[3]

We now set forth each of those tests.

---

[3] There are further refinements-slash-corollaries to these tests, many of which turn on whether the employee is at the work site at the time of the allegedly tortious conduct (in which case liability turns on whether the employee's conduct is a "substantial deviation" from his duties or instead just an act necessary to his personal "comfort, convenience, [or] health" (*Alma W. v. Oakland Unified School Dist.* (1981) 123 Cal.App.3d 133, 138-139 (*Alma W.*)), is "going or coming" to the work site (in which case liability turns on whether the employee-in-transit was on a "special errand" that incidentally benefitted the employer) (*Halliburton Energy Services, Inc. v. Department of Transportation* (2013) 220 Cal.App.4th 87, 95-96); *Jeewarat v. Warner Bros. Entertainment Inc.* (2009) 177 Cal.App.4th 427, 431), or is completely offsite (in which case liability turns more generally on whether the employee's activity was within the scope of his employment, as articulated by one or more of the tests recounted in this opinion).  Because these various rules are little more than specialized applications of one or more of the four general tests, and because they are becoming increasingly quaint as the line between "work site" and home becomes hopelessly blurred in a post-pandemic world, we focus on the four main tests rather than this intricate web of sub-rules.

13

### a.  Risk-focused test

This test focuses on whether the "risk" engendered by the employee's allegedly tortious conduct is "inherent in the working environment" or "'''may fairly be regarded as typical of or broadly incidental' to the enterprise undertaken by the employer.'''" (*Mary M.*, *supra*, 54 Cal.3d at p. 209, quoting *Perez*, *supra*, 41 Cal.3d at p. 968; *Farmers*, *supra*, 11 Cal.4th at p. 1003; *Alma W.*, *supra*, 123 Cal.App.3d at p. 139; *Baptist v. Robinson* (2006) 143 Cal.App.4th 151, 160.)  Given this focus, an employee's allegedly tortious conduct is deemed to be within the scope of employment only if that conduct is required by, engendered by, or an "'outgrowth'" of his employment.  (*Lisa M.*, *supra*, 12 Cal.4th at pp. 298, 300; *Farmers*, at p. 1005.)  Put differently, there must be "a 'nexus' between the employee's tort and the employment." (*Marez v. Lyft, Inc.* (2020) 48 Cal.App.5th 569, 582.)  This is why an employee's conduct is not within the scope of employment merely because he "uses property or facilities entrusted to him by" his employer.  (*Alma W.*, at p. 140.)

### b.  Foreseeability-focused test

As its name suggests, this test focuses on whether "'the employee's [allegedly tortious] []conduct could be *reasonably foreseen* by the employer.'" (*Alma W.*, *supra*, 123 Cal.App.3d at p. 139, italics added.)  For these purposes, the concept of "foreseeability" has a different—and, significantly, a narrower— definition than it does in tort law generally.  Under this narrower definition, an employee's allegedly tortious conduct is sufficiently foreseeable to be deemed within the scope of employment only if, "*in the context of the particular enterprise,*" the employee's "conduct is not so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of the

14

employer's business." (*Lisa M.*, *supra*, 12 Cal.4th at p. 302, italics in original; *Farmers*, *supra*, 11 Cal.4th at pp. 1003, 1009; *Rodgers*, *supra*, 50 Cal.App.3d at pp. 618-619.) As the italicized language indicates, what matters is whether "the employee's act is foreseeable *in light of the duties the employee is hired to perform*" (*Alma W.*, at p. 142, italics added; *Martinez v. Hagopian* (1986) 182 Cal.App.3d 1223, 1230), and hence whether the plaintiff's injury is the type of injury "that '"as a practical matter [is] sure to occur in the conduct of the employer's enterprise."'" (*Lisa M.*, at p. 299, quoting *Hinman*, *supra*, 2 Cal.3d at p. 959.)

        c.      Benefit- and custom-focused test

This test focuses on whether the employee's allegedly tortious conduct "*either*" (1) "provided [some conceivable] benefit to the employer" *or* (2) has otherwise become a "'customary incident of the employment relationship.'" (CACI No. 3724, italics added; *Rodgers*, *supra*, 50 Cal.App.3d at p. 620, quoting *McCarty v. Workmen's Comp. Appeals Bd.* (1974) 12 Cal.3d 677, 681-683 (*McCarty*); *Perez*, *supra*, 41 Cal.3d at p. 969 [benefit to employer is not required to impose vicarious liability].) Although a benefit need only be "conceivable," the benefit must nevertheless be "'sufficient enough to justify making the employer responsible'" for the employee's allegedly tortious conduct. (*Newland v. County of Los Angeles* (2018) 24 Cal.App.5th 676, 686.)

        d.      Public policy-focused test

This test more explicitly focuses on how neatly a finding that the employer should be vicariously liable for the employee's allegedly tortious conduct squares with the public policy rationales animating the respondeat superior doctrine. Courts have identified three rationales for the doctrine: "(1) to prevent

recurrence of tortious conduct; (2) to give greater assurance of compensation for the victim; and (3) to ensure that the victim's losses will be equitably borne by those who benefit from the enterprise that gave rise to the injury." (*Mary M.*, *supra*, 54 Cal.3d at p. 209; *Perez*, *supra*, 41 Cal.3d at p. 967; *Lisa M.*, *supra*, 12 Cal.4th at p. 304; *Farmers*, *supra*, 11 Cal.4th at pp. 1013-1014.)  The various rationales are not hermetically sealed from one another, as "vicarious liability is invoked to provide greater assurance of compensation to victims" (the second rationale) "where it is equitable to shift losses to the employer because the employer benefits from the injury-producing activity and such losses are, as a practical matter, sure to occur from the conduct of the enterprise" (the third rationale).   (*Kephart*, *supra*, 136 Cal.App.4th at p. 297.)  Respondeat superior, however, is *not* "merely a justification for reaching a 'deep pocket'"; instead, all three policy rationales are grounded in the "'deeply rooted sentiment that a business enterprise cannot justly disclaim responsibility for accidents which may fairly be said to be characteristic of its activities.'"  (*Rodgers*, *supra*, 50 Cal.App.3d at p. 618.)

Despite the different formulations of the scope-of-employment standard, the courts articulating these tests all agree that an employee's tortious acts may qualify as within the scope of employment—assuming they satisfy the pertinent test—even if the employer did not authorize the employee's conduct (*Perez*, *supra*, 41 Cal.3d at p. 969), even if the employee acted without the motive of serving the employer's interest (*Lisa M.*, *supra*, 12 Cal.4th at p. 297), and even if the employee engaged in intentional (or even criminal) conduct (*id.* at pp. 296-297).

16

## II.    Analysis

Because plaintiffs in their operative complaint as well as in their opposition to Silver's summary judgment motion seek to hold Silver liable on theories of direct liability as well as vicarious liability, we will address both theories on appeal.  We will then discuss plaintiffs' remaining arguments.

### A.    *Direct liability*

To hold Silver directly liable for Musgrove's death, plaintiffs need to establish either that (1) Silver placed Musgrove in peril and failed to protect her from that very same peril (e.g., *Regents*, *supra*, 4 Cal.5th at p. 619), or (2) Silver has a special relationship with Musgrove that otherwise obligates him to protect her (e.g., *Zelig*, *supra*, 27 Cal.4th at p. 1129).

#### 1.    *Placing in peril*

Under the operative pleading that frames the issues on summary judgment, plaintiffs seek to hold Silver liable for (1) placing Musgrove in peril by furnishing her with (a) "an excessive amount of alcohol" and (b) drugs, and (2) not preventing her from engaging in the "dangerous activit[y]" of swimming in the lagoon at night.  The evidence before the trial court at the time of summary judgment refuted the allegation that Silver "furnished" Musgrove with drugs; to the contrary, the undisputed facts showed that Silver did not supply anyone with cocaine, or have any knowledge that anyone was ingesting it.  At most, the undisputed evidence showed that Silver furnished Musgrove with alcohol in two ways—by allowing her to drink the wine served with the meals prepared by Herold and by covering the cost of any alcohol she purchased at the resort.  This is insufficient, as a matter of law, to establish liability.  That is because our Legislature has explicitly established that a private person

17

cannot be held liable in tort for furnishing alcohol to another adult. (Civ. Code, § 1714, subd. (c) ["[N]o social host who furnishes alcoholic beverages to any person may be held legally accountable for . . . injury to [that] person . . . resulting from the consumption of those beverages."]; Bus. & Prof. Code, § 25602, subd. (b) [same]; *Allen v. Liberman* (2014) 227 Cal.App.4th 46, 56 (*Allen*) [social host immunity also reaches hosts who do not directly furnish but do not stop others from drinking alcohol they make available].)

   2. *Special relationship between Silver and Musgrove*

  As noted above, employers have a special relationship with their employees, which can give rise to a duty to *control* those employees to ensure that they do not harm third parties. (Rest.3d Torts, § 40, subd. (b)(4).) This special relationship can *also* give rise to a duty to *protect* those employees. (*Brown*, *supra*, 11 Cal.5th at p. 216 ["Relationships between . . . employers and employees . . . give rise to an affirmative duty to protect."].)

  California law forecloses holding Silver liable for failing to protect Musgrove by virtue of the special relationship between an employer and employee. We come to this conclusion for three reasons.

  First, there may not be an employee-employer relationship between Musgrove and *Silver* that gives rise to any special relationship. That is because the undisputed facts show that Musgrove was employed by *Silver Pictures Entertainment*, not *Silver* himself. Plaintiffs also failed to adduce evidence bearing directly on whether Silver Pictures Entertainment was an alter ego of Silver.

18

Second, and even if we assume that Musgrove was employed by *Silver*, plaintiffs are seeking to hold Silver liable for Silver's own conduct in failing to protect her from the alcohol he furnished or subsidized. This is not a viable theory because, as noted above, California statutory law provides that a person cannot be liable in tort for furnishing alcohol to another adult. (Civ. Code, § 1714, subd. (c); Bus. & Prof. Code, § 26502, subd. (b).) This statutory prohibition trumps any potential tort liability that might otherwise come into being by virtue of any special relationship obligating Silver to protect Musgrove. (*Allen*, *supra*, 227 Cal.App.4th at p. 50 ["special relationship, by itself, does not negate the specific statutory social host immunity applicable to these facts" (that is, when the special relationship obligates the defendant to *protect* the injured party)]; cf. *Childers v. Shasta Livestock Auction Yard, Inc.* (1987) 190 Cal.App.3d 792, 798 (*Childers*) [statutory immunity does not apply when the special relationship obligates the defendant to *control* the tortfeasor].)

Third, and even if we assume that the special employment relationship between Silver and Musgrove somehow supersedes the immunity conferred by statute, Silver's duty to protect his employees is limited to while they are "at work" or otherwise in a locale the employer controls. (Rest.3d Torts, § 40, subd. (b)(4); *Colonial Van & Storage, Inc. v. Superior Court* (2022) 76 Cal.App.5th 487, 500-501.) Here, the undisputed facts show that what Musgrove needed protection from was her further alcohol consumption and ingestion of cocaine while in a private bungalow after 10 p.m.; that she was not "at work" or undertaking any work-related activities when she did so; and that Silver had no control over any private bungalow at the resort other than his own. On these facts, Silver had no employment-related duty to

19

protect Musgrove.  The fact that Silver expensed the bungalow is not enough as a matter of law.  (Accord, *Sakiyama v. AMF Bowling Centers, Inc.* (2003) 110 Cal.App.4th 398, 405-406 [business owner who leases premises not liable for injuries sustained when lessees bring illegal drugs onto premises without the owner's knowledge, causing injury to third parties].)

### B. *Vicarious liability*

To hold Silver vicariously liable for Musgrove's death under the theory articulated in the operative pleading that frames the issues on summary judgment, plaintiffs need to establish that (1) Herold engaged in negligent conduct that caused Musgrove's death, and (2) Herold was acting within the scope of his employment at the time of his negligent conduct.  As noted above, a person is negligent for placing a third party in a position of peril and then failing to protect them from that peril.  (*Regents*, *supra*, 4 Cal.5th at p. 619; *Williams*, *supra*, 34 Cal.3d at p. 23; *Zelig*, at p. 1128; *Weirum*, *supra*, 15 Cal.3d at p. 48.)  Construing the evidence in the light most favorable to plaintiffs, we independently agree with the trial court's conclusion that there exist disputes of material fact regarding whether Herold engaged in negligent conduct by placing Musgrove in peril (by supplying her with alcohol *and*, allegedly, cocaine in the late evening while knowing that she enjoyed swimming at night in the lagoon), and then failing to protect her from that peril.  (Accord *Carlsen v. Koivumaki* (2014) 227 Cal.App.4th 879, 894-895 (*Carlsen*) [defendant is negligent for transporting a visibly intoxicated person to a hillside cliff and then failing to protect him from falling]; cf. Civ. Code, § 1714, subd. (c) [merely furnishing alcohol cannot be a basis for liability].)  Thus, assuming it to be true that Herold placed Musgrove in peril and failed to protect her, Silver's

20

vicarious liability for Musgrove's death turns on whether Herold was acting within the scope of his employment when he engaged in that tortious conduct.

As explained below, we independently agree with the trial court's conclusion that the undisputed (or assumed) facts establish as a matter of law that Herold was not acting within the scope of his employment under any of the pertinent tests.

### 1. *Risk-focused test*

Silver employed Herold as his family's personal chef; for the August 2015 trip, Herold's job was to purchase groceries and then to prepare lunches and dinners for the members of Silver's entourage who accompanied him in Bora Bora. Herold's conduct in meeting up with Musgrove at 10 p.m. in one of their private bungalows to consume wine and cocaine was not required by, engendered by, or any outgrowth of Herold's job as Silver's chef. (*Lisa M.*, *supra*, 12 Cal.4th at pp. 298, 300.) Thus, the risk of harm to Musgrove attendant to Herold's conduct in placing her in peril and then failing to protect her is not, as a matter of law, """inherent in [his] working environment""" and cannot "'fairly be regarded as typical of or broadly incidental to'" Silver's enterprise of employing Herold as his family's personal chef. (*Mary M.*, *supra*, 54 Cal.3d at p. 209; *Farmers*, *supra*, 11 Cal.4th at p. 1033; *Alma W.*, *supra*, 123 Cal.App.3d at p. 139.)

Plaintiffs resist this conclusion, arguing that Herold sent an email to Musgrove on the evening of August 18 from the kitchen at a time when he was still preparing dinner, such that all of Herold's conduct later that night was necessarily an "outgrowth" of that initial email. This argument rests on a misreading of the test. The pertinent question is whether the employee's negligent conduct (and its attendant risk) was an

21

outgrowth of his job, not whether a plaintiff can identify something the employee did while at work that may have set the stage for his subsequent negligent conduct. Herold's flirtation with Musgrove had nothing to do with his job duties as Silver's personal family chef. What is more, the fact that Herold met Musgrove on prior trips where they were brought together because Herold happened to be Silver's personal family chef and Musgrove happened to be Silver's executive assistant does not mean that Herold's conduct in the course of their personal relationship is an outgrowth of Herold's employment as a chef.

        2.     *Foreseeability-focused test*

Herold's conduct in furnishing Musgrove with additional alcohol and with cocaine while aware that she might try to go swimming was not, as a matter of law, a "reasonably foreseeable" result of his employment as Silver's personal family chef. That is because, "in the context of th[at] particular enterprise" of working as a chef, his conduct during his personal interaction with Musgrove is "so unusual or startling that it would seem unfair to include the loss resulting from it among other costs of" Silver's business of employing Herold as a chef. (*Lisa M.*, *supra*, 12 Cal.4th at p. 302.) In other words, we conclude as a matter of law that the type of injuries Musgrove suffered were not ""as a practical matter . . . sure to occur in the conduct"" of Silver's employment of Herold as his family's personal chef and the duties that being a chef entailed. (*Id.* at p. 299; *Alma W.*, *supra*, 123 Cal.App.3d at p. 144.)

Plaintiffs urge that Herold's conduct was foreseeable because Silver either never adopted any anti-drug/anti-alcohol policy or never communicated such a policy to Herold. This argument relies on the concept of foreseeability as it is used for a

test of negligence in general, rather than the more specialized and narrower concept of foreseeability applicable when imposing *respondeat superior* liability and which, as noted above, views foreseeability through the prism of the employer's enterprise and the employee's duties. (*Rodgers*, *supra*, 50 Cal.App.3d at pp. 618-619 [contrasting the two tests].) The various definitions of foreseeability are not interchangeable. Tort law is more like baking than cooking; there are specific doctrines, each with its own recipe and whose ingredients cannot be casually swapped. When viewed through the *proper* prism, Musgrove's tragic death is not a foreseeable consequence of Herold's work as Silver's chef.

      3.    *Benefit- and custom-focused test*

Silver is also not vicariously liable, as a matter of law, under the test that examines whether the employee's tortious conduct (1) conceivably benefited the employer or (2) was a customary incident of the employment relationship. (CACI No. 3724; *Rodgers*, *supra*, 50 Cal.App.3d at p. 620.) That is because Herold's conduct in imperiling Musgrove by furnishing her additional alcohol and cocaine did not in any conceivable way benefit Silver's employment of Herold as his family's personal chef. For much the same reason, Herold's imperiling conduct was not a "customary incident" of the employment relationship; there is no evidence that anything like this had ever happened before with anyone in Silver's employ. What is more, the fact that Herold happened to be at the resort where he was providing his chef services for Silver and that Herold had the chance to use his free access to amenities to furnish the alcohol Musgrove drank is insufficient to establish vicarious liability. (*Alma W.*, *supra*, 123 Cal.App.3d at p. 140 [employee's "presence at the place of employment before, during, or after the commission of the

23

offense" and "[t]he mere fact that an employee has the opportunity to abuse the facilities necessary to the performance of his duties" each insufficient to create vicarious liability].)

Plaintiffs urge that they have established triable issues of material fact under this test because Silver's practice of furnishing alcohol to Herold at meals and allowing Herold to expense any further alcohol consumption while traveling with Silver benefitted Silver because it was a job perquisite that kept Herold happy (and hence in Silver's employ) and was a customary incident of Herold's employment. We disagree. Plaintiffs' argument ignores that what matters for this analysis is whether the employee's *tortious conduct* benefits the employer or is a customary part of the employment relationship. According to the allegations of plaintiffs' operative complaint, Herold's tortious conduct was plying Musgrove with alcohol and cocaine and allowing her to swim. *That* conduct is different from—and far more egregious than—Herold's conduct in simply drinking the alcohol Silver supplied or subsidized. It is analytically inappropriate to conflate the two.

4. *Public policy-focused test*

Treating Herold's conduct as outside the scope of his employment as Silver's chef is also warranted as a matter of law under the test that looks directly at the three main public policy rationales animating respondeat superior liability. Although holding Silver liable for Herold's conduct in imperiling Musgrove would undoubtedly make strides toward "prevent[ing the] recurrence of [similar] tortious conduct" and "giv[ing] greater assurance of compensation [to] the victim" (*Mary M.*, *supra*, 54 Cal.3d at p. 209), these two factors will *always* counsel in favor of imposing liability because they will be furthered *whenever* a

24

defendant is held vicariously liable for a plaintiff's injury. The critical policy consideration is whether holding Silver liable for Herold's conduct in imperiling Musgrove would "ensure that [her parents'] loss[] will be *equitably* borne by those who benefit from the enterprise that gave rise to the injury." (*Ibid.*, italics added.) Whether "it is equitable to shift losses to the employer" turns on whether "the employer benefit[ted] from the injury-producing activity and [whether] such losses are, as a practical matter, sure to occur from the conduct of the enterprise." (*Kephart, supra*, 136 Cal.App.4th at p. 297.) Where the employee's "injury-producing activity" is "'simply too attenuated'" from his duties for "the enterprise," there is no vicarious liability as a matter of law. (*Id.*; *Farmers, supra*, 11 Cal.4th at p. 1017.) Here, it is inequitable to shift the burden of loss onto Silver because Silver did not benefit from Herold's "injury-producing activity" of supplying Musgrove with more alcohol and with cocaine late at night before she was likely to go swimming, and because this conduct is not, "as a practical matter, sure to occur from" Herold's employment as Silver's personal family chef. In sum, Herold's malfeasance and nonfeasance is "simply too attenuated" from his job duties as a chef to make it equitable to tag Silver with liability arising out of Herold's tortious conduct.

Plaintiffs nonetheless suggest that it is equitable to hold Silver liable for Herold's late-night activities because Herold, as Silver's personal family chef, has no fixed working hours and hence was effectively on-call to prepare meals at any time. As a result, plaintiffs reason, it is fair to hold Silver vicariously liable even for Herold's late-night private conduct with others like Musgrove. This argument is a nonstarter, as courts have "expressly reject[ed] any suggestion that reason, fairness or

25

public policy necessarily demands 24-hour employer liability for the conduct of employees who are on-call 24 hours a day." (*Le Elder v. Rice* (1994) 21 Cal.App.4th 1604, 1607; *id.* at p. 1609 ["Public policy would be ill-served by a rule establishing 24-hour employer liability for on-call employees, regardless of the nature of the employee's activities at the time of an accident."]; *Sunderland v. Lockheed Martin Aeronautical Systems Support Co.* (2005) 130 Cal.App.4th 1, 12 [same].) Applying this "no liability" rule makes particular sense here, where the employer had no control over Herold's injury-producing activities and where those activities are wholly unrelated to his work duties as Silver's chef.

## C.     *Plaintiffs' remaining arguments*

Plaintiffs raise one further category of arguments—namely, that precedent (and four cases in particular) dictates that the trial court's summary judgment ruling is wrong. As explained below, we disagree.

First, plaintiffs cite *Carlsen*, *supra*, 227 Cal.App.4th 879. In *Carlsen*, a group of ministry students took their "clearly intoxicated" friend to an after-party on the edge of a high cliff. When he suffered injuries stumbling over that cliff, he sued the ministry students. *Carlsen* held that summary judgment for the students was inappropriate on these facts because they put the plaintiff in a position of peril by taking him to a cliffside gathering when the plaintiff was obviously drunk, which obligated them to protect him. (*Id.* at pp. 894-895.) *Carlsen* supports what we have assumed to be true in this case based on the disputes of material fact—namely, that *Herold* had a duty to protect Musgrove after he put her in a position of peril by giving her alcohol and cocaine. But *Carlsen* says nothing about whether

26

Silver should be held vicariously liable for Herold's negligence (as *Carlsen* did not deal with employer-employee relationships at all). And *Carlsen* says nothing about whether Silver should be held directly liable (as there is no evidence in this case that Silver imperiled Musgrove beyond furnishing or subsidizing her alcohol intake, which is an act for which he cannot be found liable by statutory law).

Second, plaintiffs cite *Rodgers*, *supra*, 50 Cal.App.3d 608. In *Rodgers*, two employees of a contractor suffered injuries in a melee with two drunken employees of a subcontractor. The subcontractor had maintained an ironically named "dry house" on the work premises where it offered its employees alcohol to encourage them to stay onsite after their work shifts in case the subcontractor needed to recruit additional help for the round-the-clock job. (*Id.* at p. 615.) The melee grew out of a dispute about the proper operation of work equipment. (*Id.* at pp. 615-616.) When the injured employees sued the *subcontractor* (on the theory that it was vicariously liable for the conduct of its employees), *Rodgers* held that it was error to grant summary judgment for the subcontractor because its provision of alcohol at the "dry house" had become "customary" and because the employees' "continued presence after completion of their work shift was 'conceivably' of some benefit to" the subcontractor because "[i]t was a convenience to [the subcontractor] to be able to recruit additional help by simply contacting employees remaining in or about the job site." (*Id.* at p. 620.) *Rodgers* did no more than apply the benefit- and custom-focused test, which we have already found to dictate a finding for Silver as a matter of law. Unlike the subcontractor in *Rodgers* who supplied the alcohol that was the direct impetus of the melee that caused the

27

plaintiffs' injuries, Silver in no way made it a custom or benefitted from Herold's conduct in supplying Musgrove with alcohol and drugs during a late-night rendezvous in a private bungalow.

Third, plaintiffs cite *Childers*, *supra*, 190 Cal.App.3d 792. In *Childers*, an auction yard "routinely furnished alcohol on the premises to customers and employees to encourage good customer relations." (*Id.* at p. 806.) When a third party was injured by an employee who partook of the auction yard's alcohol and sued the auction yard, *Childers* held that the employer's conduct in furnishing alcohol in order to further its business enterprise was sufficient to ward off summary judgment on a theory of vicarious liability. (*Id.* at pp. 805-806.) *Childers* is inapposite. Silver's payment of all of his guests' expenses, including Herold's alcohol tabs, has no connection with and certainly does not further the enterprise of Silver's employment of Herold as his personal family chef.

Lastly, plaintiffs cite *Purton v. Marriott International, Inc.* (2013) 218 Cal.App.4th 499 (*Purton*). In *Purton*, a hotel hosted a company party where it served alcohol to its employee-attendees. When one of its employees killed a third party in an auto accident while still drunk from alcohol imbibed at the party, the third party's family sued the hotel under a vicarious liability theory. *Purton* held that summary judgment for the hotel was not warranted; the hotel could be liable, *Purton* reasoned, because the party was "a 'thank you' for its employees" and an exercise in "improving employee morale and furthering employer-employee relationships" that directly benefitted the hotel's business enterprise. (*Id.* at pp. 509-510; accord *McCarty*, *supra*, 12 Cal.3d at p. 682 [office party where alcohol served benefits company by

"foster[ing] company camaraderie" and "provid[ing] an occasion for the discussion of company business"]; *Harris v. Trojan Fireworks Co.* (1981) 120 Cal.App.3d 157, 159, 163-164 (*Harris*) [office party where alcohol served benefits company by "improv[ing] employer/employee relations," "providing [employees] with [an] opportunity for social contact," and constituting a "fringe benefit" that "increase[s] the continuing of employment"].)

This case is different: Silver did not host a company party where he furnished the alcohol and drugs ingested by Herold and Musgrove; he subsidized alcohol, and Herold went off on his own time and in his own space to consume more substances with Musgrove. Even if we ignore this critical difference, plaintiffs continue that Silver's "business" benefitted by subsidizing Herold's alcohol intake because such a perquisite was likely to make Herold happier (as the sole employee of Silver's enterprise of hiring a chef) and hence likely to make him stick around longer as Silver's personal family chef. This is not what *Purton* holds, and *McCarty* and *Harris* involved additional benefits to the employer such as providing opportunities for camaraderie between employees and an opportunity to discuss company business. We decline to read *Purton*, *McCarty*, or *Harris* as holding that any perquisite that an employer offers its employee is sufficient, by itself, to justify the imposition of vicarious liability because such a rule would vastly expand such liability to apply to just about every employee in the workforce. This would ride roughshod over the carefully balanced policy inquiry that animates—and circumscribes—the doctrine of respondeat superior.

29

## DISPOSITION

The judgment is affirmed.  Silver is entitled to his costs on appeal.

### CERTIFIED FOR PUBLICATION.


_____, J.

HOFFSTADT


We concur:


_____, P. J.

LUI


_____, J.

ASHMANN-GERST


30